[No. S005170. Crim. No. 26428. Dec. 28, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM ADOLF NOGUERA, Defendant and Appellant.

COUNSEL

Donald Specter and Alison Hardy, under appointments by the Supreme Court, and Arnold Erickson for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Rudolf

Corona, Jr., and Janelle B. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ARABIAN, J.**—Defendant William Adolf Noguera was convicted by a jury of one count of first degree murder. (Pen. Code, §§ 187, 189; all statutory references are to this code except as indicated.) The jury also found that in committing the murder, defendant used dangerous and deadly weapons, namely, a martial arts tonfa and a wooden dowel (§ 12022, subd. (b)); it also found true a special circumstance allegation that the murder was committed for financial gain. (§ 190.2, subd. (a)(1).) Following a penalty trial, the jury returned a verdict of death. We affirm the judgment.

### FACTS

### I. GUILT PHASE EVIDENCE

#### A. *The murder of Jovita Navarro: the prosecution's case.*

Sometime between 11:30 on the night of April 23, 1983, and 4:30 the following morning, Jovita Navarro was murdered in the bedroom of her La Habra bungalow. La Habra police found Jovita's body after being summoned by a "911" call from Mindy Jackson, Jovita's next-door neighbor. After securing the area, investigating officers went to the Jackson residence where they interviewed Dominique Navarro, Jovita's 16-year-old daughter. Dominique told them she had returned from a date with her then-18-year-old boyfriend around 2:00 that morning; after chatting briefly with her mother, who was reading in bed, and removing her makeup, Dominique had gone to bed and to sleep. She was awakened a few hours later, she said, by muffled noises coming from her mother's adjacent bedroom.

After a few minutes, Dominique heard her mother cry out, "get out, mi hija ("hija" is Spanish for "daughter"), get out, mi hija." Frightened, and unsure what was afoot in the darkened house, Dominique told Mindy Jackson that she sat at the end of her bed for "about 5 to 15 minutes," before running blindly down the hall and out the back door. As she ran, she heard a "thumping" sound coming from her mother's bedroom, followed by what sounded like the footsteps of someone close behind her.

Reaching Mindy Jackson's house, Dominique banged on the door until Jackson answered. In tears and near hysteria, according to Jackson, Dominique said that someone was hurting her mother; she begged Jackson to return

to the house with her. Jackson refused. Instead, she managed to telephone 911. Authorities logged in the emergency call at 4:43 a.m.

To the casual observer, the murder scene suggested that Jovita had been killed in the course of a combined rape and burglary. Her body was found lying across the bed, her feet touching the floor. Her nightgown had been pulled up around her neck, and a pair of blue women's underpants was wadded between her thighs. The contents of the bedroom were in disorder— bedding and blankets had been pulled from the bed and thrown haphazardly on the floor; a jewelry box, normally resting on a dresser, was found upended on the hall floor, its contents of costume jewelry scattered along the hallway.

Jovita had been badly beaten, mainly on the face and head. She had suffered extensive facial injuries, including dental and eye damage from at least 18 blows to the face and head; her skull had multiple depressed fractures and her scalp had been loosened and torn by the force of the beating; her nose almost touched her left cheek and "defensive wounds" were evident on her arms and hands. On her left thigh, examiners found oval shaped wounds.[1] Blood was spattered on the walls, furniture, and ceiling of the bedroom.

The pathologist who examined the body testified that the proximate cause of Jovita Navarro's death was not the beating but asphyxiation—induced by pressing a rounded object against her throat with such force that her larynx was crushed, choking off her airway. Extensive cyanosis, or blueing, of her lips and pinpoint hemorrhaging beneath her eyelids confirmed that Jovita had, in effect, been strangled. Had she not died from a lack of oxygen, the pathologist concluded, the severity of the beating would have resulted in her death.

In the bedroom, La Habra police investigators found a "tonfa," a martial arts weapon fashioned from red oak and resembling a police baton; it lay shattered in two pieces, testimony to the savagery of the beating. In a neighboring yard, police recovered a piece of wood shaped like a broom handle, with traces of blood on it. In another yard, they found a bloodstained tan leather glove; bloodstains were also found on a cinder block wall adjoining a nearby lot. The bloodstains on the tonfa, the wooden dowel, and the glove were the same type as Jovita's. An analysis of fibers removed from

---

[1] At trial, extensive testimony by forensic ondontologists was presented by both sides, pro and con, as to whether the wounds were human bite marks and, if so, when they were inflicted. The prosecution placed in evidence casts of the teeth of 12 individuals, including defendant, to support its claim that defendant had bitten Jovita in the act of killing her.

the brick wall and the glove were consistent with those found on the bedroom blanket.

La Habra and Orange County authorities began an extensive forensic investigation of the crime scene. As a result, investigators concluded that much of the evidence pointing to a burglary and rape/murder of Jovita had been faked. An autopsy failed to reveal the presence of sperm in Jovita's vagina. An analysis of vaginal swabs was consistent with a finding that the victim might have had intercourse several hours earlier the preceding evening, but there was no external evidence of sexual trauma consistent with a forcible rape. Tests of the blue underwear for semen or other stains indicative of forcible sex were negative.

Although the bedroom appeared to have been rifled, nothing of value was missing, including a clear plastic change purse stuffed with small bills that the intruder could not have overlooked. The jewelry box had been knocked from its place and its contents scattered, but none of the jewelry had been taken. An analysis of the blood-spattering pattern on the bed linen suggested that it had been removed from the bed and arranged on the floor *after* the murder, rather than during a struggle. Moreover, the spatter analysis indicated that Jovita had probably been murdered *before* the contents of the bedroom had been upended. Finally, investigators could find no evidence that Jovita's killer had gained entry into the house by force.

The on-scene criminalist, examining the body at 6:30 that morning, initially estimated the time of death at between three and six hours prior to his examination, or between 12:30 and 3:30 a.m. Although routine examinations for lividity and rigor mortis—two crude measures used to approximate time of death—confirmed that estimate, it was later revised upward, to 4:45 a.m., based on Dominique's statement to the police that she had heard her mother cry out around 4:30 that morning.

After conducting an autopsy on the morning of April 24, the examining pathologist concluded on the basis of the quantity and state of the contents of her stomach that Jovita died sometime between 12:30 and 2:30 that morning. Another criminalist, who observed the body at the autopsy, testified that the 4:45 a.m. time of death stated in the certificate of death was based on Dominique's account of the murder. Although that hour was not substantially out of line with the results of the lividity and rigor tests, had it not been for Dominique's statement the condition of the body suggested that death

had occurred between three and seven hours earlier, or between 11:30 the preceding evening and 3:30 that morning.[2]

An inquiry into Jovita's financial circumstances disclosed that she carried $13,000 in life insurance and at the time of her death had approximately $14,000 in accumulated retirement benefits from her job as an Orange County welfare clerk. The house, with a market value of around $90,000, had an existing mortgage balance of $7,000; Jovita carried mortgage insurance in the event of her death. Dominique was her sole heir.

As their investigation deepened, police learned from interviews with Margaret Garcia, a coworker, and Mindy Jackson that relations between Jovita and Dominique's boyfriend, the defendant, were not always pleasant. Jovita had quarrelled with both over Dominique's repeated violations of curfew hours, over her pregnancy and subsequent abortion, and over what Jovita regarded as a steep decline in Dominique's schoolwork and attendance beginning with the onset of her relationship with defendant. Garcia and Jackson both testified that Jovita was planning to sell the house and move to the beach, or to enlist Dominique in the Army, in an attempt to separate her from defendant. According to Garcia, Jovita had considered hiring a "hit man" to kill defendant. About two weeks before her death, Garcia said, Jovita told her that she had awakened in the middle of the night to find the front door open and all the outside lights off. Jovita found Dominique wandering the house; Dominique told her that she had opened the front door, but could not explain why.

About two or three weeks before Jovita's murder, Jackson had witnessed her screaming into the telephone and had seen Dominique in the bathroom crying. Jovita had slammed down the handset and said that she "hated" defendant and didn't want to hear his name again. "If he [defendant] is going to use his karate on me, he has another thing coming," Jackson reported Jovita as saying.

Through interviews with Dominique and defendant, authorities learned that on the night of Jovita's death the two had gone to a party in West Covina about 7:00. They left around 11:30 that evening, they told police, and went for a hamburger with a friend; after dropping their friend off, they parked for an hour or two, returning to Jovita's house between 1:30 and 2:00 a.m. Dominique let herself in, locked the front door, opened a sliding glass door at the rear of the house in order to let the family dogs out, and turned off the outside lights. After chatting briefly with her mother, she went to bed.

---

[2] As of 2 a.m. on April 24, 1983, the seasonal change from standard to daylight saving time occurred; clocks were set forward by one hour.

Defendant told police that after leaving Dominique's house, he went home. Because he had missed the 1:30 curfew set by his mother, he had to knock on the front door to get in. His grandmother, who was watching television with his mother, let him in. After talking with them and being lectured by his mother about being late, he went to bed.

La Habra police also interviewed Peter LaCombe, a diesel mechanic employed by the county who had been dating Jovita for about two weeks before her death. LaCombe had spent the evening of April 23 with Jovita at her house. The two ate a substantial dinner around 7:30 and then danced and watched television. Around 11:00 that evening, LaCombe testified, he left for home.

From interviews with the adjoining neighbor, Mindy Jackson, police learned that Jackson and her husband had entertained a friend, Tom Brooks, on the night of the murder. All three had heard loud noises coming from the Navarro house around 11:00 p.m. Brooks testified that he had gone outside to investigate but had noticed nothing remarkable; the house was dark and the sliding glass door at the rear was closed. Later that night, they heard what Brooks described as "really radical noises" next door. The three had gone outside about 1:45 a.m. They heard Jovita's two dogs barking and growling; there were no lights either outside or inside the Navarro house.

Despite discrepancies in the accounts given by Dominique and defendant and others interviewed, and suspicions presented by the forensic analyses, police made no arrests in the case until late in the year. In December, the police inspector assigned to the investigation, Sergeant Keltner, received a tip from Steve Arce, an acquaintance of defendant, that Ricky Abram might have information relevant to the homicide investigation. Keltner interviewed Abram on December 14, 1983, at the Ione Juvenile Detention Facility near Sacramento, where Abram was an inmate. He tape-recorded most of their conversation.

In substance, Abram testified at trial that he decided to disclose his knowledge of the murder scheme after Keltner told him of his possible criminal liability for Jovita's murder. Abram told the jury that in March 1983, a few weeks after he first met defendant, the two had driven in defendant's car to pick up Dominique at her house. On the way over, defendant told Abram that he intended to kill Dominique's mother. He asked for Abram's help in borrowing a shotgun for that purpose. After picking up Dominique, the three drove to Bob's Big Boy, a nearby restaurant. There, according to Abram, they discussed in detail defendant's plan to murder Jovita.

The murder, Abram testified, would be staged to look as if Jovita had been killed by a burglar in the middle of the night. Dominique's role would be to let the two men into the house; Abram would fake the burglary and take any items of value; defendant would kill Jovita with a shotgun blast. Defendant and Dominique would then have intercourse, Abram said, after which Dominique, feigning a rape, would run hysterically next door to report the break-in and murder/rape. For his part in the crime, defendant promised Abram $5,000 from the $25,000 obtained from "the mother's insurance." In addition to his share of the insurance, Abram told the jury, defendant promised he could live in Jovita's house with defendant and Dominique, since "the house would be passed on to the daughter after the mom's death."

After leaving the restaurant and returning Dominique to her house, defendant dropped Abram off. In early April, Abram was arrested for auto theft, convicted and imprisoned. He testified that he did not see defendant or Dominique again until the trial, regarded the murder scheme as a "joke," and did not learn of Jovita's death until Keltner told him.

Police interviews with others provided additional evidence of defendant's involvement in the murder. Steve Arce told the jury of a fight he had with defendant around the Easter preceding Jovita's death. Defendant had used his feet to quickly knock Arce to the ground. Arce had also seen tonfas in defendant's car and had seen defendant spinning a tonfa in his hand. He had seen defendant wearing tan leather motorcycle gloves on occasion, and had seen him with Ricky Abram. He also related an incident about a month before Jovita's death in which defendant kicked two individuals in a street encounter, knocking one of them to the ground in "thirty seconds maybe," using martial arts techniques. A couple of weeks before the murder, Arce had heard defendant complain about Jovita's interference in his relationship with Dominique; defendant had said that he wanted "to kill that bitch," referring to Jovita.

In the months following Jovita's death, investigators learned, Dominique spoke frequently with defendant by telephone from an uncle's house, where she was now living. Once, the uncle testified, he overheard Dominique complain after completing a call from defendant that she did not want to call the family attorney again; she was upset, her uncle said. The attorney, Dominique's cousin, confirmed that Dominique made a growing number of telephone calls to him in the months following Jovita's death; her questions centered on the disposition of the family home and details concerning the amount of Jovita's insurance, the sums due creditors, and any surplus in the estate; Dominique was "very emphatic," he testified, that she did not want the house to be sold. That June, the attorney attended a meeting with

defendant, his mother, Dominique, and another lawyer at which the possibility of Dominique's legal emancipation was discussed.

In December 1983, authorities arrested Dominique and defendant. Charged with one count of conspiracy to commit murder and one count of first degree murder, Dominique was tried as a juvenile, convicted and sentenced to the custody of the Youth Authority; her conviction was affirmed on appeal.

### B. *The defense case.*

Defendant testified in his defense. His relations with Jovita were "fair," he said; sometimes they got along well, sometimes not. He had lived at the Navarro residence for a few months in 1982 with Jovita's consent. The three regularly had dinner out about once a month. Defendant denied any involvement in Jovita's death. He had talked to Ricky Abram once about selling him an automobile engine; they had gone to Bob's Big Boy with Dominique. While they had lunch, Dominique had complained that her mother had restricted her for coming home late. He never saw Abram again. Defendant had studied martial arts as a young teenager, but had not earned a black belt and had no training in the use of a tonfa; nor had he ever owned one. He had been badly stabbed in the thigh in a fight in June of 1982, still walked with a limp and had difficulty stretching one of his legs. He had never had any knowledge of Jovita's life insurance.

On the night of Jovita's murder, defendant testified, he had gone with Dominique to a party in West Covina. After a hamburger with a friend, the two had parked for awhile. He dropped Dominique off at her house around 2:00 that morning, went home and, after talking with his mother and grandmother, went to bed. About 3:30 a.m., he heard a knock on his window. It was Margaret Noone, a friend; he let her in and she stayed in bed with him for about an hour before leaving by the window. Around 6:00 a.m., Dominique had telephoned; she was very upset; defendant dressed and left immediately for her house.

Defendant's sister supported his testimony regarding the injury to his leg and the fact that he had never received training in or owned a tonfa. His grandmother confirmed that defendant had arrived home around 2:00 on the morning of Jovita's murder.

Defendant's mother testified that he returned home at exactly 2:00 on the morning of April 24, 1983—she had been watching a program on Spanish television and remembered the time. She spoke to defendant briefly as to

why he was late. Later that night, defendant's mother heard the sound of voices in her son's room. Through the door, she asked defendant who was there; he told her to go to sleep and later refused to tell her the identity of his visitor. Asked about the meeting with Dominique's attorney in June of 1983, at which Dominique's legal emancipation was discussed, Mrs. Noguera testified that she had earlier accompanied Dominique to the Social Security office in an effort to help her receive some benefits—she had been without any income in the five months since her mother's death. A previous attorney had done nothing, and Dominique needed help.

Margaret Noone testified that around 3:00 a.m. on April 24, 1983, she had climbed into the window of defendant's bedroom and stayed for about one and one-half hours. She left when she heard someone knocking on the bedroom door.

Two of defendant's friends testified to prior conversations with Ricky Abram and Steve Arce. Wilbur Boring told the jury that in December of 1983, after he had implicated defendant in Jovita's murder, Abram had told him that "he [defendant] got what he deserved; he put me in jail so I put him in jail." Patrick Reese testified that Arce had told him that he cooperated with the police in exchange for immediate release on a felony charge; Arce had observed a pair of nunchuku sticks in defendant's possession, not tonfas, and had told Reese that he (Arce) should not have told the police some of the things he told them.

### C. *Rebuttal.*

The prosecution recalled Margaret Noone to the stand. She stated that, in testifying on behalf of defendant, she had "lied . . . [about] basically almost everything" because she "was getting threats if I didn't say something like that [i.e., her alibi testimony] something would happen to me or my family because [defendant] has such powerful friends, even though he's in jail." She had seen nunchuku sticks in defendant's car, and he liked to "mess around with them." Noone told the jury that she had been granted immunity from prosecution by the People.

In addition, the trial court took judicial notice that Dominique had been called as a witness by the prosecution, had refused to testify, and been adjudged in contempt of court. A deputy marshal testified that shortly after Dominique was held in contempt, he heard defendant say to another inmate that Dominique "did a good job and tell her I love her."

## II. PENALTY PHASE EVIDENCE

### A. *The prosecution's case.*

John Antenucci testified that in August 1983, he placed a newspaper advertisement to sell a used Volkswagen. Accompanied by a friend, defendant responded to the advertisement and expressed an interest in buying the automobile. The three went for a test drive, during which defendant stopped the car and told Antenucci to get out because his friend "has a gun." Defendant's friend displayed a handgun and threatened to shoot Antenucci, who managed to grab the car keys and escape.

### B. *The defense case.*

Defendant called 15 witnesses, including a former employer, his high school girlfriend, and several friends of his family. Several witnesses testified that defendant's family was very close until his parents were divorced in 1980. His mother testified that defendant, who had hunted, fished, and gone on motorcycle trips with his father, appeared to take the divorce hard; he became quieter, more serious, less playful. She asked the jury to spare her son's life. Defendant's sister and grandmother also asked the jury not to impose the death penalty.

Several witnesses testified to defendant's participation in the California Blue Jacket Cadette Corps, a youth organization modeled on the Navy. Junior high school authorities testified to his participation in such sports as basketball, track, softball, and football; elementary school employees testified that defendant's parents had been involved actively in his schooling.

DISCUSSION

## I. GUILT PHASE ISSUES

### A. *Claims of evidentiary error.*

#### 1. *Admission of victim's hearsay statements.*

Defendant contends that the trial court erred in admitting into evidence over objection—through the testimony of Mindy Jackson, a neighbor, and Margaret Garcia, a coworker of Jovita—several statements in which Jovita expressed both fear and a dislike amounting to hatred of defendant. If offered to prove that defendant was the killer, the statements obviously were relevant: they tended to prove that he had made threats of physical harm to

Jovita in the past and, inferentially, that he carried them out on the night of April 23. For that purpose, however, the statements were hearsay and inadmissible unless authorized by a recognized exception. (Evid. Code, § 1200.)

The People argue that, although hearsay, Jovita's statements were admissible, not to prove their content (that is, that defendant in fact made such threats, thereby supporting the inference that he later carried them out), but for the limited purpose of establishing Jovita's state of mind at or near the time she was murdered. Such a limited "state of mind" exception is authorized by Evidence Code section 1250, subdivision (a)(1), which provides in substance that, if not otherwise untrustworthy, hearsay statements reflecting an existing state of mind of the speaker are not inadmissible when limited to proof of the declarant's state of mind.[3]

The People's argument, however, overlooks an essential requirement of Evidence Code section 1250. Apart from a single anomaly, our cases approving the admission of hearsay statements under the exception codified in Evidence Code section 1250, subdivision (a)(1)—the state of mind exception—explicitly recognize the requirement that the declarant's mental state be factually relevant; that is, that it be, in the words of the statute, "itself an issue in the action."

In *People* v. *Ruiz* (1988) 44 Cal.3d 589, 607-610 [244 Cal.Rptr. 200, 749 P.2d 854], for example, we held that the trial court's admission of the hearsay testimony of three murder victims expressing their fear of the defendant was error because "neither the states of mind of these victims prior to their deaths . . . nor their acts or conduct . . . were an issue in the case which might have been resolved or assisted by the challenged evidence." (*Id.* at p. 608.) "As our cases have made clear," we said, " 'a victim's out-of-court statements of fear of an accused are admissible under [Evidence Code] section 1250 only when the victim's conduct in conformity with that fear is in dispute. Absent such dispute, the statements are irrelevant.' " (*Ibid.*, quoting from *People* v. *Armendariz* (1984) 37 Cal.3d 573, 586 [209 Cal.Rptr. 664, 693 P.2d 243]; see also *People* v. *Thompson* (1988) 45 Cal.3d 86, 103

---

[3]In full, Evidence Code section 1250 provides: "(a) Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when:

"(1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or

"(2) The evidence is offered to prove or explain acts or conduct of the declarant.

"(b) This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed."

[246 Cal.Rptr. 245, 753 P.2d 37]; *People* v. *Bunyard* (1988) 45 Cal.3d 1189, 1204 [249 Cal.Rptr. 71, 756 P.2d 795]; *People* v. *Ireland* (1969) 70 Cal.2d 522, 529 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323].)

We went on to observe in *People* v. *Ruiz, supra,* 44 Cal.3d 589, that "a victim's prior statements of fear are not admissible to prove *the defendant's* conduct or motive (state of mind). If the rule were otherwise, such statements of prior fear or friction could be routinely admitted to show that the defendant had a motive to injure or kill." (*Id.* at p. 609; italics in original.)

The anomaly in our case law, *People* v. *Merkouris* (1959) 52 Cal.2d 672 [344 P.2d 1], upheld the admission of hearsay statements by two murder victims concerning threats against them by the defendant, offered to prove that the threats were carried out in the subsequent homicides. That holding, however, as we pointed out in *People* v. *Ruiz, supra,* 44 Cal.3d at page 609, was repudiated by the Legislature in 1965 (when it enacted subdivision (b) of Evidence Code section 1250) as one " 'based on a rationale that destroys the very foundation of the hearsay rule.' "[4]

■ Thus, hearsay statements of victims concerning fears of or threats against them by the accused, when offered to prove the conduct of the accused, are not within the exception to the hearsay rule embodied in Evidence Code section 1250. ■ Here, neither Jovita's state of mind nor her conduct was relevant to any part of the People's case; nor did the defense raise any issue concerning her state of mind or behavior at or before the night she was murdered. The entire thrust of the defense case went to the identity of the killer and defendant's alibi that he was attending a party miles away from the crime scene for much of the evening and spent the remainder of the night at home with his family.

Jovita's state of mind or conduct not being an issue in either the prosecution or defense case, her hearsay statements reflecting dislike and fear of defendant failed to satisfy the requirement that the declarant's "state of mind, emotion, or physical sensation . . . [be] itself an issue in the action." (Evid. Code, § 1250, subd. (a)(1).) It was thus error for the trial court to admit them into evidence. (*People* v. *Ruiz, supra,* 44 Cal.3d at p. 609.)[5]

Although error, we conclude that the admission of Jovita's hearsay statements does not require reversal. While much of its evidence—apart from the

[4]Subdivision (b) of Evidence Code section 1250 provides that "This section [i.e., 1250] does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed."

[5]Because we conclude that the admission of Jovita's hearsay testimony was error under section 1250, we need not decide defendant's additional claims that admission of the hearsay testimony violated Evidence Code sections 1101 and 352.

testimony of Ricky Abram and Steve Arce—was circumstantial, the prosecution presented a strong case supporting the conclusion that Jovita Navarro was murdered by defendant. Moreover, much of the testimony admitted as part of what defendant contends was "frustrated mother's gossip" was heard by the jury through other witnesses—both defendant and Dominique admitted that his relations with Jovita were not always good, that she wanted Dominique to date others and was concerned about the decline in Dominique's schoolwork. Finally, the trial court gave the jury an instruction limiting the use it could make of the challenged hearsay testimony to Jovita's state of mind—a limitation repeated by the prosecutor in his closing guilt phase argument to the jury.[6] Despite the error, admission of the hearsay statements added little to a substantial case pointing to defendant's guilt.

For that reason also, we reject defendant's claim that admission of Jovita's hearsay statements violated his rights secured under the confrontation clauses of the federal and the California Constitutions. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) In light of the substantial evidence pointing to defendant's guilt, we conclude that the error in admitting the challenged hearsay statements was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

### 2. *Admission of character evidence.*

Defendant next argues that it was error to admit, over a timely objection, Steve Arce's testimony relating his fight with defendant (in which defendant used martial arts techniques), and a subsequent street fight (in which defendant again used martial arts techniques to quickly knock down one of his opponents). Arce's testimony should have been excluded under Evidence Code section 1101, defendant argues, because it was nothing more than evidence of "prior bad acts," in effect used by the prosecution to show that defendant was a "bad character," who habitually used martial arts to beat up others. As relevant here, Evidence Code section 1101 provides that character evidence (whether shown by opinion, reputation, or conduct) is inadmissible to prove conduct on a specific occasion. Evidence of a crime or other acts is admissible, however, when relevant to prove a fact other than a disposition to commit such acts.

Both sides acknowledge that defendant's familiarity with martial arts was shown by other evidence. Indeed, defendant contends that the challenged

---

[6]For example, prior to Margaret Garcia's testimony concerning Jovita's statements, the trial court instructed the jury that "the communications . . . from the deceased . . . to this witness are limited to the effect to [*sic*] the state of mind of the victim only and you're not to consider it for any other purpose." A similar admonition accompanied Mindy Jackson's testimony.

testimony was inadmissible under Evidence Code section 1101 because it was "merely cumulative" (*People* v. *Thompson* (1980) 27 Cal.3d 303, 318 [165 Cal.Rptr. 289, 611 P.2d 883]). The People argue that Arce's testimony concerning the martial arts incidents was directed at countering testimony of defendant and his sister, as well as statements by Dominique in the transcript of her police interview, that defendant had only limited use of his left leg since being stabbed in the thigh with a knife a year before Jovita's murder and thus could not have used martial arts on Jovita.

At trial, the prosecutor's theory supporting the admissibility of Arce's testimony was that it "puts [defendant's] familiarity with martial arts very close to the [date of the] victim's death." At the prosecution's request, the trial court gave a limiting instruction, telling the jury that the challenged martial arts testimony "was not offered to prove that the defendant is, in fact, a bad person, but as to the value it may have to you as to his knowledge of martial arts and skills therein." In addition, at the close of the guilt phase, the trial court gave the jury a more extensive instruction similarly limiting the use of Arce's martial arts testimony.

The rationale offered by the prosecutor adequately identified an exception to the bar on admissibility imposed by Evidence Code section 1101. It is true that, as the defense points out, there was other evidence that defendant had studied and practiced martial arts. That evidence, however, was comparatively remote in time to the murder. The testimony of Arce placed defendant's use of his martial arts skills—linked to the crime scene by the presence of the broken tonfa—to within one month of Jovita's murder. In addition, the evidence was relevant to prove defendant's identity as Jovita's killer, an additional exception to the bar of section 1101. (Evid. Code, § 1101, subd. (b).) Under the circumstances, we conclude there was no error.[7]

3. *Admission of Dominique's hearsay statements under the coconspirator exception.*

◼ Next, defendant contends that certain statements of Dominique—made in the course of a police interview on the morning of April 24th, to Mindy Jackson on the same day, and to a private attorney several months later—were erroneously admitted into evidence under Evidence Code section 1223, the coconspirator exception to the hearsay rule, despite a defense objection. We conclude that, for the most part, the statements of Dominique were offered for a nonhearsay purpose, that is, to establish the existence of

---

[7]Because the issue is not raised by the People, we do not reach the potential question of what effect passage of the "truth in evidence" provision of Proposition 8 (Cal. Const., art. I, § 28, subd. (d)) has on the evidentiary limitations embodied in Evidence Code section 1101.

a conspiracy between Dominique and defendant by demonstrating that Dominique was lying to the police and to Mindy Jackson in the account she gave them of her role in Jovita's murder. These statements were thus not subject to the strictures of Evidence Code section 1223. The remaining statements, relating to the existence of an "insurance conspiracy" between Dominique and defendant and made to her lawyer several months after the killing, *were* offered to prove the truth of the matter stated therein. However, although hearsay, they fell within the coconspirator exception of Evidence Code section 1223.

The statements at issue consist of Dominique's description of the events surrounding Jovita's murder (e.g., her return home from her date with defendant, retiring only to be awakened by thumping sounds and her mother's screams) made to Mindy Jackson on the morning of April 24; a tape recording of Dominique's "hysterical" 911 call made about the same time; and statements made by Dominique to investigating officers the day after the murder, including a tape recording of a two-hour police interview that evening. In addition, questions asked by Dominique of her lawyer concerning the nature and value of the assets of Jovita's estate and related matters, together with an uncle's testimony concerning an overheard telephone conversation between Dominique and defendant, were admitted into evidence.

It is plain from the record before us that the facially exculpatory statements made by Dominique to Mindy Jackson, the 911 operator, and the investigating officers were not offered by the prosecution to prove the truth of their content. Rather, they were offered to help demonstrate to the trier of fact the existence of a preconceived plan by defendant and Dominique to murder Jovita and plant a false trail of evidence indicating a burglary and rape gone awry. Given that evidentiary role, the nonhearsay statements were not subject to the independent corroboration requirements of Evidence Code section 1223. (Evid. Code, § 1200, subd. (a).)

The remaining statements of Dominique challenged by defendant as inadmissible under the coconspirator exception were offered by the prosecution to prove the truth of their content. If credited, they suggest to the trier of fact that the alliance between defendant and Dominique encompassed not only Jovita's murder, but receipt of the assets of her estate, including her house, life insurance, and pension income.

Given the prosecution's theory of the case, embracing successive but interdependent objectives, the precise evidentiary issue with respect to Dominique's statements to her lawyer and in the telephone conversation with defendant is whether there was evidence sufficient to support a prima

facie finding of a so-called "insurance conspiracy" (*People* v. *Leach* (1975) 15 Cal.3d 419, 436 [124 Cal.Rptr. 752, 541 P.2d 296]) *independent* of the challenged declarations. We conclude that there was such evidence in the testimony of Ricky Abram. If credited by the trier of fact, Abram's testimony established the existence of a plan among the three conspirators to murder Jovita, and subsequently to divide the proceeds of her estate and reside together in the Navarro household.

Abram's testimony alone was sufficient to establish the three preliminary facts necessary for the admission of hearsay statements under the coconspirator exception, that is, that Dominique was participating in the conspiracy at the time she made the statements, that her declarations were in furtherance of the conspiracy, and that the defendant was a member of the conspiracy at the time the declarations offered against him were made. Although made months after Jovita's death, Dominique's statements to her attorney, occurred at a time when the ultimate objective of the conspiracy—securing the life insurance proceeds and the house—had yet to be achieved. (*People* v. *Hardy* (1992) 2 Cal.4th 86, 139 [5 Cal.Rptr.2d 796, 825 P.2d 781]; *People* v. *Sully* (1991) 53 Cal.3d 1195, 1231 [283 Cal.Rptr. 144, 812 P.2d 163]; *People* v. *Leach, supra,* 15 Cal.3d at p. 430-431, fn. 10; *People* v. *Saling* (1972) 7 Cal.3d 844 [103 Cal.Rptr. 698, 500 P.2d 610].)

Finally, because Dominique's statements fell within an exception to the hearsay rule that is "firmly . . . rooted in our jurisprudence," no independent inquiry into their reliability need be undertaken for purposes of satisfying the confrontation clause of the federal Constitution. (*Bourjaily* v. *United States* (1987) 483 U.S. 171, 183 [97 L.Ed.2d 144, 157, 107 S.Ct. 2775]; see also *People* v. *Hardy, supra,* 2 Cal.4th 86, 151; *People* v. *Sully, supra,* 53 Cal.3d 1195, 1231; *People* v. *Brawley* (1969) 1 Cal.3d 277, 286-291 [82 Cal.Rptr. 161, 461 P.2d 361].) We therefore reject defendant's claim to the contrary.

4. *Admission of Dominique's hearsay declarations regarding her use of makeup.*

Over a defense objection, the trial judge permitted Mindy Jackson to relate to the jury a statement made to her by Dominique "two or three months" before Jovita's murder to the effect that Dominique maintained a good complexion by removing her makeup every night before going to bed. On the basis of that statement, combined with observations of Jackson and a responding officer that Dominique had makeup running down her tear-stained face when interviewed early on the morning of April 24, the prosecution was able to argue to the jury that Dominique's account of Jovita's

murder (i.e., that she was awakened by sounds from her mother's bedroom) was fabricated.

██ Defendant contends that the only possible basis for admitting Dominique's hearsay declarations concerning her nightly practice of removing her makeup is the coconspirator exception of Evidence Code section 1223. However, defendant argues, the statement fails to satisfy the requirement that it be made "in furtherance of the objective of [the] conspiracy." (Evid. Code, § 1223, subd. (a).) Moreover, defendant argues, the erroneous admission of Dominique's hearsay statements was seriously prejudicial. In his closing argument, the prosecutor repeatedly referred to the fact that Dominique was wearing makeup when she appeared at Mindy Jackson's house the morning after the murder, and the jury asked during the course of its deliberations to review Jackson's testimony.

We agree that the challenged hearsay statement did not qualify for admission under the coconspirator exception of Evidence Code section 1223, the basis specifically relied upon by both the prosecution and by the trial court in admitting it. Lacking any apparent connection with the plan to murder Jovita as alleged by the prosecution, the statement could not have been in furtherance of the conspiracy, as required by subdivision (a) of the statute. Defendant's claim that admission of the challenged statement regarding Dominique's makeup habits was "seriously prejudicial" to his defense is substantially undercut, however, by similar evidence in the record which is not challenged, and by the cumulative—indeed, minor—role the contested hearsay statement likely played in the jury's deliberations.

Evidence was admitted in the form of a transcript of a tape recording of Dominique's interview with the investigating officers on the day following Jovita's murder in which she stated that, before going to bed on the night of the murder, she had removed her makeup or "most of it." Moreover, as noted, both Mindy Jackson and Officer Rees testified that Dominique was wearing makeup on the morning of April 24. Jackson testified that Dominique wore "heavy makeup," a fact she regarded as "unusual"; Rees testified that Dominique's face was "streaked" with makeup. It was this disparate evidence of Dominique's use of makeup on the morning of April 24 that the prosecution relied on in its closing argument, including, it is true, the hearsay statement of Dominique's makeup habits erroneously admitted by the trial court. The latter testimony, however, constituted only a small part of the entire evidence on the makeup point, the bulk of which was unchallenged.

Likewise, the jury's mid-deliberation request for a transcript of Mindy Jackson's testimony was part of a request for transcripts of the testimony of

Peter LaCombe and Tom Brooks. With respect to Jackson's testimony, the jury asked specifically for extracts concerning "observations of Dominique when she came to the [Jackson's] front door." In context, the request suggests that the jury was interested in reviewing much of the testimony surrounding the events of the night of April 23-24, including Dominique's appearance when she knocked on Mindy Jackson's door that morning, rather than the erroneously admitted hearsay statement regarding Dominique's nightly practice of removing her makeup.

Given the early hour, and Dominique's testimony that she had been awakened from sleep by the sounds of a struggle, it is likely that a reasonable juror would be more impressed with the fact that Dominique was wearing makeup at all, rather than by the contested "habit" evidence that she always removed her cosmetics before going to bed. We conclude, therefore, that although not admissible under the coconspirator exception, it is not reasonably probable that defendant would have obtained a more favorable result had Dominique's hearsay statement not been admitted.

B. *Accomplice issues.*

1. *Admission of Ricky Abram's prior consistent statement.*

In his cross-examination of Ricky Abram, defense counsel suggested that the witness had a motive to fabricate his testimony because of his prior confinement under California Youth Authority jurisdiction, subsequent arrests following his California Youth Authority discharge, and an expectation of benefits in exchange for his favorable testimony against defendant. On redirect examination, the trial court permitted the prosecution, over objection, to introduce into evidence a tape recording and transcript of the December 1983 interview between Abram and Sergeant Keltner. In all substantial respects, the interview corroborated Abram's trial testimony regarding the origin and details of the conspiracy to murder Jovita. It thus tended to reinforce in the jurors' minds the impression that Abram was truthful.

Defendant contends that the tape recording and transcript of Abram's interview with Keltner were inadmissible as a prior consistent statement under Evidence Code section 791 because they failed to meet the requirement that the statement be made "before the bias, motive for fabrication, or other improper motive is alleged to have arisen." (Evid. Code, § 791, subd. (b).) Here, the defendant's claim is that any improper motive Abram might have had arose at the time of the interview with Keltner and thus that, in the words of the codifiers of the Evidence Code, "the logical thrust of the [prior

consistent statement] is lost." (See Cal.Law Revision Com. com. to Evid. Code § 791, subd. (b), 29B West's Ann. Evid. Code (1966 ed.) § 791, p. 373.)

Defendant relies on *People* v. *Coleman* (1969) 71 Cal.2d 1159 [80 Cal.Rptr. 920, 459 P.2d 248], a capital case in which we held it was error to admit, under the prior consistent statement exception, hearsay declarations made by a crime partner of the accused to his wife and father. The People, seizing on the specific nature of the questions concerning a motive to fabricate his testimony asked Abram on cross-examination, rely on our statements in *People* v. *Andrews* (1989) 49 Cal.3d 200 [260 Cal.Rptr. 583, 776 P.2d 285], and *People* v. *Bunyard, supra,* 45 Cal.3d 1189, that " '[t]he mere asking of questions [by the defense] may raise an implied charge of improper motive . . .' " (49 Cal.3d at p. 210, quoting 45 Cal.3d at p. 1209), thus invoking the exception of Evidence Code section 791, subdivision (b).

We addressed this precise question in *People* v. *Hayes* (1990) 52 Cal.3d 577 [276 Cal.Rptr. 874, 802 P.2d 376]. There, the defendant argued that it was error to admit into evidence a prior consistent statement by a prosecution witness offered to rehabilitate his testimony because the witness was on probation at the time of the statement and otherwise had motives to fabricate. We framed the issue presented by these circumstances as being "whether, when a witness's testimony may have been influenced by multiple biases or motives to fabricate, a prior consistent statement is admissible if made before the existence of *any one or more* of the alleged biases or motives to fabricate or only if made before the existence of *all* such biases and motives." (52 Cal.3d at p. 609, italics in original.)

In resolving the issue in *People* v. *Hayes, supra,* 52 Cal.3d 577, we cited and relied on *People* v. *Andrews, supra,* 49 Cal.3d 200, 210-211, and summarized *Andrews* as deciding, "in effect, that a prior consistent statement is admissible if it was made before the existence of any one or more of the biases or motives that, according to the opposing party's express or implied charge, may have influenced the witness's testimony. [Citations.]" (52 Cal.3d at p. 609.) Our statement of the issue and the controlling legal rule in *People* v. *Hayes, supra,* focuses on the governing inquiry in administering Evidence Code section 791, namely, that a prior consistent statement is admissible as long as the statement is made before the existence of any one of the motives that the opposing party expressly or impliedly suggests may have influenced the witness's testimony.

Here, the thrust of defense counsel's cross-examination of Ricky Abram sought to explore, in light of his cooperation in testifying against defendant,

the existence and nature of any agreements with law enforcement authorities to obtain early parole or assistance in the favorable disposition of multiple criminal charges brought against him *after* the December 1983 interview with Keltner. Although defendant argues that Abram had a motive to minimize his potential penal liability as soon as Keltner told him that he was liable criminally as a coconspirator, as *People* v. *Hayes, supra,* 52 Cal.3d 577, makes clear, the focus under Evidence Code section 791 is the specific agreement or other inducement suggested by cross-examination as supporting the witness's improper motive. Indeed, that is the distinction the court seems to have had in mind when we wrote, in *People* v. *Bunyard, supra,* 45 Cal.3d at page 1209, that "[t]he mere asking of questions may raise an implied charge of an improper motive. . . ," and thus invoke Evidence Code section 791. (See also *People* v. *DeSantis* (1992) 2 Cal.4th 1198, 1229 [9 Cal.Rptr.2d 628, 831 P.2d 1210] [*People* v. *Andrews, supra,* 49 Cal.3d 200, applied where a defendant's cross-examination of his crime partner concerning possible modification of his sentence in exchange for testimony "yielded a compelling additional incentive to lie."]; *People* v. *Coleman, supra,* 71 Cal.2d 1159; *People* v. *Duvall* (1968) 262 Cal.App.2d 417 [68 Cal.Rptr. 708].)

### 2. *Instructions concerning corroboration of accomplice testimony.*

█ The trial court gave the jury both CALJIC No. 2.27 (testimony of a single witness is sufficient for the proof of any fact) and CALJIC No. 3.11 (accomplice testimony must be corroborated in order to convict). Defendant contends that the two instructions are contradictory and in combination confused the jury, permitting defendant to be convicted on the basis of Ricky Abram's uncorroborated testimony alone.

We have encountered this claim repeatedly since our initial consideration of it in *People* v. *Chavez* (1985) 39 Cal.3d 823, 829-832 [218 Cal.Rptr. 49, 705 P.2d 372]. In *Chavez,* we concluded that "we must look to the entire charge, rather than merely one part, to determine whether error occurred. [Citation.]" (*Id.,* at p. 830.) █ We have since refined the test formulated in *Chavez* to encompass determinations whether the jury "is instructed on the kind of evidence necessary to constitute corroboration, on the method of determining whether the accomplice's testimony was corroborated, on viewing the accomplice's testimony with distrust, and [whether] the parties proceed[ed] on the premise that corroboration is required." (*People* v. *Andrews, supra,* 49 Cal.3d 200, 217.) Where these criteria are met, there is no error. (*People* v. *Williams* (1988) 45 Cal.3d 1268, 1313 [248 Cal.Rptr. 834, 756 P.2d 221]; *People* v. *Adcox* (1988) 47 Cal.3d 207, 241 [253 Cal.Rptr. 55, 763 P.2d 906].)

 Applying these criteria to the record in this case leads us to reject defendant's claim. Although the trial judge read the jury an unmodified version of CALJIC No. 2.27, the "single witness" instruction, together with the accomplice corroboration requirement of CALJIC No. 3.11,[8] he also gave the jurors the full array of accomplice instructions, including the definition of an accomplice (CALJIC No. 3.10), the nature and sufficiency of corroborative evidence (CALJIC No. 3.12), the rule that one accomplice may not be corroborated by another (CALJIC No. 3.13), the necessity of criminal intent (CALJIC No. 3.14), and the requirement that accomplice testimony be viewed with "distrust" (CALJIC No. 3.18). In addition, it is clear from a review of the trial transcript that counsel for both the People and defendant proceeded throughout the trial on the assumption that Abram was an accomplice whose testimony required corroboration.

Thus here, as in *People v. Williams, supra,* 45 Cal.3d 1268, 1313, and *People v. Adcox, supra,* 47 Cal.3d 207, 241, we conclude that nothing in the combined instructions suggested to the jurors that corroboration of Abram's testimony was not required: "A reasonable juror would have recognized CALJIC No. 2.27 as setting forth the general rule and the charge on accomplice testimony as an exception to it. [Citations.] Nothing before us indicates that the jurors may have acted otherwise." (*People v. Andrews, supra,* 49 Cal.3d at p. 217.)

Given our conclusion that there was no instructional error, defendant's additional claim under this rubric—that the quality of Abram's uncorroborated testimony was so unreliable as to offend federal Sixth Amendment jury trial and Fourteenth Amendment due process rights—loses its underpinning. Although Abram's testimony had its frailties, they were not concealed from exposure and consideration by the jury or from attack by defense counsel. Moreover, because there was no error in giving the jury the combined single witness and accomplice corroboration charges, there is no basis upon which to conclude that the jurors relied solely on the uncorroborated testimony of Abram to convict defendant.

 In a variant on his federal Sixth Amendment claim, defendant contends that Ricky Abram's credibility was so slender a reed upon which to base the finding of a financial gain special circumstance that it violates the federal Eighth Amendment. He points to Abram's defects as a witness—the

---

[8]In *Chavez, supra,* 39 Cal.3d 823, we approved the suggestion of the Court of Appeal in *People v. Stewart* (1983) 145 Cal.App.3d 967 [193 Cal.Rptr. 799] that CALJIC No. 2.27 be modified when given in conjunction with No. 3.11. (*Chavez, supra,* at p. 831.) The current version of No. 2.27 includes such a modification (testimony concerning a fact by one witness "whose testimony . . . does not require corroboration" is sufficient proof). It was not, however, the version given the jury in this case.

circumstances under which he agreed to testify for the prosecution, the fallibility of his memory, his reference to testifying from a "script," the trial judge's remark, in the presence of the jury, that Abram had "difficulty in remembering," his serious emotional problems, prior felonies, and admission that he had lied to the police in the past. Drawing an analogy between these testimonial defects and the dangers presented by the forecasts of future violence by a psychopharmacologist which we held inadmissible in the penalty phase in *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 767-774 [175 Cal.Rptr. 738, 631 P.2d 446], defendant concludes that the jury's finding that the special circumstance was true on the basis of the uncorroborated testimony of Abram cannot be allowed to stand.

We reject the argument for two reasons. First, its underpinning assumes a predicate that we have just rejected, namely, that the jury was confused by the accomplice and single witness instructions given by the trial court into believing that Abram's testimony did not require corroboration.[9] Second, although founded in part on the inherent unreliability of psychiatric predictions of future violence, our ruling in *People* v. *Murtishaw, supra,* 29 Cal.3d 733, rested as much on the incurably prejudicial impact on a penalty jury of " 'affirmative assertion[s] by an apparently well-qualified professional . . . .' " (*Id.* at p. 773.) "One can imagine few matters more prejudicial at the penalty trial," we said, "than testimony from an established and credentialed expert that defendant, if sentenced to life without possibility of parole, would be likely to kill again." (*Ibid.*) This " 'mystic infallibility in the eyes of the jury' " (*People* v. *Kelly* (1976) 17 Cal.3d 24, 32 [130 Cal.Rptr. 144, 549 P.2d 1240]) that often envelopes quasi-scientific testimony was not, of course, present in this instance, where the jury was, we reiterate, fully capable of judging Abram's credibility.

3. *Instructions concerning withdrawal from conspiracy.*

Defendant raises the related claim that it was error to instruct the jury on the law governing the termination of penal liability by withdrawing from a conspiracy. Specifically, the trial court read the jury both CALJIC No. 3.02 (conditions for aider and abettor withdrawal) and CALJIC No. 6.20 (coconspirator withdrawal). Defendant reasons that because there was no evidence that Abram communicated a desire to withdraw from the conspiracy and because both instructions require the accessory or coconspirator to

---

[9]We do not, of course, mean to suggest that accomplice testimony admitted to prove the financial gain special circumstance must itself be corroborated. To the contrary, when the special circumstance alleged "requires only proof of the motive for the murder for which defendant has already been convicted, the corroboration requirement of [Penal Code] section 1111 does not apply." (*People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1177 [259 Cal.Rptr. 701, 774 P.2d 730], fn. omitted.)

communicate the fact of withdrawal to the other parties in order to validly terminate penal liability, giving the jury the challenged instructions somehow confused them, permitting the (improper) conclusion that Abram had ceased to be an accomplice. His testimony, in that event, need not have been evaluated with skepticism or corroborated.

We are unpersuaded. Abram's status as a jail inmate at the time of Jovita's murder reasonably raised the issue of the effect of his incarceration on his accomplice liability. In effect, the contested instructions informed the jurors that withdrawal required something more than impossibility, that is, required Abram to communicate his withdrawal to his coconspirators. We see nothing erroneous or prejudicial in such a result, especially since the effect of the challenged instructions was to favor a finding that Abram was an accomplice, and thus to require—as the jury was instructed—that his testimony be evaluated skeptically as well as corroborated.

In any event, the basic thrust of Abram's testimony was corroborated by forensic evidence gathered at the crime scene. Jovita appeared to have been killed in the dead of night by an assailant bent on burglary and rape; her daughter fled screaming from the house to report the murder. In gross outline, the manner in which Jovita's murder was accomplished tracked the plan discussed by the three at Bob's Big Boy as related by Abram in his testimony.

### 4. Instructions concerning the reasonable doubt standard.

Defendant's final claim of instructional error is that in giving the jury the standard pattern instructions on reasonable doubt and circumstantial evidence, the trial court committed *Cage* error (*Cage* v. *Louisiana* (1990) 498 U.S. 39 [112 L.Ed.2d 339, 111 S.Ct. 328] (*per curiam*) [hereafter *Cage*]). In *Cage*, the jury was instructed that it must acquit if it had a reasonable doubt as to the guilt of the accused. "Reasonable doubt," however, was defined as a doubt "founded upon a real tangible substantial basis and not upon mere caprice and conjecture." (*Id.*, at p. 40 [112 L.Ed.2d at p. 342].) Concluding that the challenged instruction "equated a reasonable doubt with a 'grave uncertainty' " and thus might have altered the constitutional standard for penal liability to " 'a moral certainty' that the defendant was guilty" (*ibid.*), the high court reversed the conviction.

By parity of reasoning, defendant argues that a like analysis applies to the pattern reasonable doubt instructions given the jury in this case. He points out that CALJIC Nos. 2.01, 2.02, 2.21 and 2.27—standard instructions on the relationship between circumstantial evidence and reasonable doubt, all of

which were given in this case—direct the jury to make findings using reasonable factual interpretations over those that require unreasonable interpretations. The asserted error was compounded, defendant argues, by the prosecutor's argument in closing that the jurors should adopt a reasonable interpretation of the evidence. Finally, defendant contends that the directory character of the instructions operated as a mandatory conclusive presumption of guilt.

In *People* v. *Jennings* (1991) 53 Cal.3d 334 [279 Cal.Rptr. 780, 807 P.2d 1009], we rejected a claim analogous in all respects to the one made here. There we pointed out that the vice of the instruction condemned in *Cage,* *supra,* 498 U.S. 39, consisted in the "transformation of true reasonable doubt, as it has been traditionally defined, into a higher degree of doubt [required to acquit]." (53 Cal.3d at p. 386.) No such possibility was presented to the jury in this case, however, where the trial court's use of standardized, pattern instructions included the language of CALJIC No. 2.90. That instruction defines a "reasonable doubt" as one that leaves "the minds of the jurors in that condition that they cannot say that they feel an abiding conviction to a moral certainty of the truth of the charge." Unadorned "moral certainty" of defendant's guilt was thus the measure given the jury in this case; there was no *Cage*-like dilution of the standard required to convict. (*People* v. *Jennings, supra,* 53 Cal.3d at p. 386; see also *People* v. *Johnson* (1992) 3 Cal.4th 1183, 1235 [14 Cal.Rptr.2d 702, 842 P.2d 1].)

Likewise, we reject as we did in *Jennings, supra,* 53 Cal.3d at page 386, the claim that jurors, charged to choose reasonable interpretations of circumstantial evidence over unreasonable interpretations, would interpret such instructions "to permit a criminal conviction where the evidence shows defendant was 'apparently' guilty, yet not guilty beyond a reasonable doubt." (*Ibid.*) The same is true of defendant's claim that the standard reasonable doubt instructions regarding circumstantial evidence are in effect irrebutable presumptions of guilt. "Read in context, the instructions merely require the jury to reject unreasonable interpretations of the evidence, and to accept the reasonable version of the events which fits the evidence." (*Ibid.*; see also *People* v. *Wilson* (1992) 3 Cal.4th 926, 943 [13 Cal.Rptr.2d 259, 838 P.2d 1212].)

C. *Challenge to special circumstance instruction regarding proof of* *"financial gain."*

Defendant's single claim of error under this rubric has four parts. ██ Fixing on the dual character of the motive alleged by the prosecution for Jovita's murder—eliminating the chief obstacle to the relationship between defendant and Dominique and acquiring the principal assets of her

estate—defendant argues that the failure of the standard CALJIC instruction to require the jury to find that the financial gain motive was (variously) a "dominant," "substantial," or "significant" motive for the murder violated the federal Eighth Amendment requirement that capital offenses be narrowly defined to encompass the limited class of crimes that morally justify imposition of the death penalty. (See, e.g., *McCleskey* v. *Kemp* (1987) 481 U.S. 279, 305 [95 L.Ed.2d 262, 286, 107 S.Ct. 1756].)

Second, defendant contends that our opinion in *People* v. *Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468], striking the special circumstance of murder in the commission of a robbery, requires reversal of the conviction here. In *Green*, the evidence showed that defendant had taken certain items from the murder victim, both immediately before and after killing her, for the purpose of concealing her identity and obstructing his detection. We held that the jury's finding that the robbery special circumstance was true could not stand under such facts, where "the defendant's intent [was] not to steal but to kill and the robbery [was] merely incidental to the murder." (*Id.* at p. 61.)

Third, defendant claims that under *People* v. *Howard* (1988) 44 Cal.3d 375 [243 Cal.Rptr. 842, 749 P.2d 279], the trial court should have instructed the jury that the financial-gain special circumstance could only be found true if defendant harbored such a motive at the time of the killing. Finally, defendant contends that by giving the standard language of CALJIC No. 2.51 (motive is not an element of the crime and need not be shown) with respect to the murder of Jovita, the trial court confused the jury, misleading it into believing that the financial-gain special circumstance need not be proven.

These arguments are foreclosed by our holdings in *People* v. *Howard, supra,* 44 Cal.3d 375, and *People* v. *Edelbacher* (1989) 47 Cal.3d 983 [254 Cal.Rptr. 586, 766 P.2d 1]. In *People* v. *Howard,* we rejected the claim that the unadorned language of the financial-gain special-circumstance instruction was flawed because it failed to convey to the jury any requirement that financial gain be the "direct" or "motivating cause" of the murder. Instead, we concluded that the drafters intended no such limitation. Although we recognized in *Howard* that we had been led in *People* v. *Bigelow* (1984) 37 Cal.3d 731, 751 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723], to engraft a limiting gloss on the reach of the financial-gain special circumstance "to prevent overlapping special circumstances findings based on the same conduct" (44 Cal.3d at p. 410), we also noted that "*Bigelow* does not expressly require that instructions utilizing the limited construction adopted in that opinion be given in all cases." (*Ibid.*) Moreover, the risk of multiplicity that impelled the result in *Bigelow* is not present in this case.

In context, defendant's overbreadth argument is no different from the one rejected in *People* v. *Edelbacher, supra,* 47 Cal.3d 983, that the failure to instruct the jury that the financial-gain special circumstance requires a finding of causal proximity violates the Eighth Amendment. We held in *Edelbacher* that "Proof of actual pecuniary benefit to the defendant from the victim's death is neither necessary nor sufficient to establish the financial-gain special circumstance." (*Id.* at p. 1025.) Instead, we invoked the formulation in *People* v. *Howard, supra,* 44 Cal.3d at page 409, that " 'the relevant inquiry is whether the defendant committed the murder in the expectation that he would thereby obtain the desired financial gain.' " (*People* v. *Edelbacher, supra,* 47 Cal.3d at p. 1025.) "[S]o construed," we concluded, "the special circumstance provision is not unconstitutionally vague or overbroad." (*Ibid.*) Nothing in defendant's arguments here persuades us to revisit that conclusion.

 Defendant's additional claim, founded on our holding in *People* v. *Green, supra,* 27 Cal.3d 1, that we should gloss the financial-gain special circumstance to require a finding that financial gain was the "primary goal" of the killing, is simply a variation on the claims made and rejected in *People* v. *Howard, supra,* 44 Cal.3d 375, and *People* v. *Edelbacher, supra,* 47 Cal.3d 983. Our holding in *Green* was designed to avoid the risk that a jury might impose the death penalty "on the basis of whether in the course of committing a first degree murder the defendant happens to engage in ancillary conduct that technically constitutes robbery or one of the other listed [special circumstance] felonies . . . ." (27 Cal.3d at p. 61.)

That holding has no obvious application to the evidence in this case, where the facts fail to lend support to any claim that the requisite intent to the special circumstance finding was somehow "ancillary" to the commission of the murder or only a "technical" special circumstance. Defendant either had an expectation of financial benefit at the time of the killing or he did not. It was for the jury to make that determination, applying a common sense, nontechnical understanding of "financial gain."

 For closely related reasons, we reject defendant's claim that our holding in *People* v. *Howard, supra,* 44 Cal.3d 375, required the trial judge sua sponte to give the jury a pinpoint instruction that before it could find the financial gain special circumstance true, it had to find that defendant possessed the required intent at the time of the killing. Contrary to defendant's reliance on *People* v. *Howard, supra,* 44 Cal.3d 375, that case is authority for the opposite proposition.

Indeed, *Howard* stands for the proposition that, except for the limited gloss of *People* v. *Bigelow, supra,* 37 Cal.3d 731, the special circumstance of

murder for financial gain "is not a technical one" and that the Legislature "intended [it] to cover a broad range of situations." (*People* v. *Howard, supra,* 44 Cal.3d at p. 410.) "It is well settled," we continued, "that where the terms 'have no technical meaning peculiar to the law, but are commonly understood by those familiar with the English language, instructions as to their meaning are not required.' " (*Id.,* at p. 408.) Here, as in *Howard,* "there is no necessity in this case for further refinement or restrictive interpretation of the [financial-gain] special circumstance in the absence of additional indications that the statutory language itself could have caused confusion." (*Id.,* at p. 410.)

■ Last, defendant's claim that giving the jury CALJIC No. 2.51 (motive is not an element of the crime charged and need not be proven) permitted it to dispense with proof of financial gain also fails. We rejected the identical claim in *People* v. *Edelbacher, supra,* 47 Cal.3d at page 1027, on the commonsense ground that here, as there, the " 'crime charged' was murder and any reasonable juror would have understood the instruction as referring to this substantive offense only and not to any special circumstance allegation."

D. *Claim that cumulative guilt phase errors require reversal.*

■ Defendant's final claim of error at the guilt phase of his trial is that, in combination, the multiple errors alleged to have occurred denied him a fair trial and led to a constitutionally unreliable penalty verdict. Again, we are not persuaded. As our review of defendant's guilt phase claims in light of the record in this case indicates, the evidentiary error in admitting, through the testimony of Mindy Jackson and Margaret Garcia, the hearsay declarations of Jovita that she feared and disliked defendant was not prejudicial in light of other evidence of guilt and the limiting instruction given the jury. So, too—and for the same reasons—was the admission of Dominique's statement regarding her nightly makeup habits.

The evidence presented to the jury by the prosecution made out a strong, albeit in many respects circumstantial, case for defendant's guilt. The frailties in Ricky Abram's testimony were exposed to the jury through extensive cross-examination by defense counsel. On this record, we cannot say it is reasonably probable that defendant would have secured a more favorable result had the challenged evidence not been admitted. (*People* v. *Gordon* (1990) 50 Cal.3d 1223, 1253-1254 [270 Cal.Rptr. 451, 792 P.2d 251]; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Likewise, we conclude that any errors were harmless beyond a reasonable doubt. (*Chapman* v. *California, supra,* 386 U.S. 18.)

## II. PENALTY PHASE ISSUES

### A. *Alleged prosecutorial misconduct in penalty phase closing argument.*

■ Defendant asserts that several comments made by the prosecutor during his closing argument at the penalty phase amounted to prejudicial misconduct. Defendant's trial counsel failed to make any objection throughout the course of the prosecutor's closing penalty argument. We are thus met at the outset with the contention of the People that any errors have been waived.

Governing law is straightforward. ■ To preserve for appellate review a claim of prosecutorial misconduct, a defendant must raise a timely objection and, if practicable, request a curative admonition; except where a timely objection would be futile, absent such an opportunity for the trial court to consider the claim of misconduct and to remedy its effect, any error is waived and we will not review it. (*People v. Green, supra,* 27 Cal.3d at pp. 27-34 & fn. 19; *People v. Miranda* (1987) 44 Cal.3d 57, 108, fn. 30 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People v. Benson* (1990) 52 Cal.3d 754, 794 [276 Cal.Rptr. 827, 802 P.2d 330]; *People v. Gordon, supra,* 50 Cal.3d at p. 1269.) We have repeatedly (and recently) rejected the claim that capital cases require a different rule regarding the effect of a failure to interpose claims of curable prosecutorial misconduct. (See, e.g., *People v. Miranda, supra,* 44 Cal.3d at p. 108, fn. 30; *People v. Gordon, supra,* 50 Cal.3d at p. 1269; *People v. Benson, supra,* 52 Cal.3d at p. 794.)

■ Judged against these rules, we conclude that the claims of prosecutorial misconduct in the closing argument of the penalty phase were waived by trial counsel's failure to make any objection. Assuming there was misconduct, all of the claims—encompassing assertions that the prosecutor expressed a personal opinion concerning the gravity of the offense, compared defendant to an imaginary and less culpable defendant, improperly relied on less serious noncapital homicides to claim that defendant's offense could not be mitigated, and attempted to remove sympathy from the jury's penalty consideration—could have been cured by a timely objection, followed by an instruction from the trial court to cease the line of objectionable argument, and a curative admonition to the jury to disregard the prosecutor's improper remarks.

■ We also reject defendant's alternative claim that trial counsel's failure to object to the alleged misconduct amounted to ineffective assistance of counsel. Having reviewed the record with respect to each of the instances of alleged misconduct, we are persuaded that there is not a reasonable

likelihood that any of the challenged comments might have been misconstrued by the jurors. (*People* v. *Clair* (1992) 2 Cal.4th 629, 662-663 [7 Cal.Rptr.2d 564, 828 P.2d 705].) The prosecutor neither vouched personally for the death penalty as an appropriate sentence (see, e.g., *People* v. *Benson, supra,* 52 Cal.3d at pp. 794-795) nor argued on the basis of facts not in evidence (see, e.g., *People* v. *Bolton* (1979) 23 Cal.3d 208, 212 [152 Cal.Rptr. 141, 589 P.2d 396]). We do not, in short, think that a reasonable juror would have understood the prosecutor to urge the death sentence based on either a personal opinion or facts not in evidence. (*People* v. *Benson, supra,* at p. 793.)

B. *Claim of error in penalty determination instructions (Brown error).*

At the close of the penalty phase, the trial court instructed the jury concerning the scope of its sentencing function as follows: "After having heard all of the evidence and having heard and considered the argument of counsel, you shall consider and take into account and be guided by the applicable factors of aggravating and mitigating circumstance upon which you have been instructed. [¶] The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale. You are free to assign whatever weight you deem appropriate to each and all of the various factors upon which you have been instructed. By weighing the totality of various circumstances, you must determine which penalty is appropriate, death, or life without the possibility of parole. [¶] If, in your reasoned judgment, you conclude that the aggravating circumstances outweigh the mitigating circumstances and you personally believe death is the appropriate sentence under all the circumstances, then you shall impose death. In the event that you cannot so find, you shall impose life without the possibility of parole."

■■■ Defendant asserts that this instruction was error under *People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440], reversed on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]. In *Brown,* we considered the claim that the text of the unadorned language of section 190.3 (as embodied in then-CALJIC No. 8.84.2) could be construed to permit unconstitutional capital sentences by misleading penalty juries as to the nature of their function. We concluded that the instruction and the underlying Penal Code provision were not subject to such a construction but that, under some circumstances, the instruction might confuse a penalty jury regarding the fundamental character of the capital sentencing process.

We identified two sources of potential confusion. First, the emphasis in the instruction on the process of weighing aggravating against mitigating

circumstances smacked of a mechanical task in which contending factors are quantified, toted up, and balanced, with the resulting sum pointing unerringly to either death or life. Second, we concluded that the use of the word "shall" in the instruction, directing the jury to impose either death or a sentence of life without parole depending upon the outcome of the weighing process, might be misunderstood to "force[ ] [jurors] to impose death on [a] basis other than their own judgment that such a verdict was appropriate under all the facts and circumstances of the individual case." (*People* v. *Brown, supra*, 40 Cal.3d at p. 540, fn. omitted.)

The penalty determination instruction given the jury in this case was not the instruction challenged in *People* v. *Brown, supra*, 40 Cal.3d 512. Indeed, the transcript of the chambers conference at which counsel and the trial judge discussed proposed penalty instructions indicates that the instruction challenged by defendant as erroneous under *Brown* was drawn with full knowledge of our opinion in that case. The question before us is whether, as modified, the instruction passes muster in light of the twin concerns we expressed in *Brown*. We conclude that it does.

First, the instruction incorporated language conveying unmistakably to the jury that its sentencing determination was not the result of a mechanical sequence (". . . not . . . a mere mechanical counting of factors on each side of an imaginary scale"). In addition, the instruction emphasized the discretionary nature of the jurors' weighing function ("You are free to assign whatever weight you deem appropriate to each and all the various factors upon which you have been instructed."). Of equal importance, the instruction underlined the requirement that each juror be convinced personally that death was the appropriate judgment (". . . If . . . you personally believe death is the appropriate sentence under all the circumstances . . . .").

The fact that the challenged instruction included the mandatory "shall" is not per se fatal to its validity. We have rejected claims of *Brown* error in several cases in which the challenged instruction included such language. In *People* v. *Hayes, supra*, 52 Cal.3d at pp. 641-643, we held that the use of an instruction in the form of former CALJIC No. 8.84.2—tracking almost verbatim the language of section 190.3—was not prejudicial in light of an additional instruction "that virtually eliminated any risk that the jury would be misled as to its sentencing discretion or as to the process of penalty determination." (52 Cal.3d at p. 642.) And in *People* v. *Hendricks* (1988) 44 Cal.3d 635 [244 Cal.Rptr. 181, 749 P.2d 836], we said that "it is not improper per se to instruct the jury that it 'shall' impose death." (*Id.* at p. 653; see also *People* v. *Allen* (1986) 42 Cal.3d 1222, 1279, fn. 38 [232 Cal.Rptr. 849, 729 P.2d 115].)

Our opinion in *People* v. *Boyde* (1988) 46 Cal.3d 212 [250 Cal.Rptr. 83, 758 P.2d 25], affirmed *sub nom. Boyde* v. *California* (1990) 494 U.S. 370 [108 L.Ed.2d 316, 1105 S.Ct. 1190], furnished a rationale for the analytical method behind the results in these cases. In *Boyde*, we held that, despite use of an unadorned section 190.3 instruction, the concerns expressed in *People* v. *Brown*, *supra*, 40 Cal.3d 512, were satisfied by other emphases on the jurors' discretion in valuing the weight given to each of the relevant sentencing factors. This emphasis was decisive on the issue of *Brown* error, we said, because "when jurors are informed that they have discretion to assign whatever value they deem appropriate to the factors listed, they necessarily understand that they have discretion to determine the appropriate penalty. The task of assigning weights to factors is not an arid exercise performed in a vacuum; it is the very means by which the jury arrives at its qualitative and normative decision as to the appropriate penalty." (46 Cal.3d at p. 253; see also *People* v. *Burton* (1989) 48 Cal.3d 843, 873 [258 Cal.Rptr. 184, 771 P.2d 1270].)

That rationale applies here. Given the modifications in the instruction made in light of the concerns expressed in *Brown*, *supra*, 40 Cal.3d 510, we do not think there is a reasonable likelihood that a juror would have misunderstood the nature of his or her role in the capital sentencing process—either as one involving a mechanical quantification of relevant factors or *requiring* the imposition of the death penalty. (*People* v. *Clair*, *supra*, 2 Cal.4th at pp. 662-663.)

 Defendant also claims prejudice arising from the failure of the instruction to include language regarding the role of sympathy in the jury's evaluation of the circumstances relevant to its penalty determination. We disagree. In a supplemental instruction given the jury immediately after the challenged penalty determination instruction, the trial court told the jurors that "[y]ou may consider pity and sympathy for the defendant in deciding the penalty to be imposed on the defendant." Although defendant points out that this supplemental instruction was not integral to the penalty determination instruction itself, we find nothing to suggest, given the close proximity of the "sympathy" and penalty determination instructions, that a reasonable juror would have retired to deliberate defendant's fate under the impression that sympathy was not a legitimate component of the sentencing equation.

Defendant contends, however, that a question put to the trial judge by the jury foreman during the course of deliberations demonstrates the confusion engendered among the jurors by the modified instruction. Moreover, the argument continues, the answer to the query given by the trial court—a rereading of the challenged instruction—failed to clarify the point of confusion and led, quickly and inevitably, to a sentence of death. We examine these arguments next.

### C. *Claim of error in answering the jury's mid-deliberation inquiry.*

As noted, *ante*, at a point in their deliberations, the jurors sought guidance from the trial court in the form of answers to two questions. The second question asked, "[i]f the jury finds aggravating circumstances exceed the mitigating circumstances, is it still possible for the jury to find the appropriate sentence is life without the possibility of parole?"[10] Before responding, the trial judge heard argument from counsel. The defense position was that the appropriate response was an unqualified "yes"; the prosecution requested that the penalty determination instruction previously given the jury be reread without comment. The trial judge adopted the prosecution's position and reread to the jury the modified penalty determination instruction set out above. (See, *ante*, at p. 639.) Soon after being reread the instruction (within 20 minutes, according to the defense), the jury returned a verdict of death.

■■■ Defendant argues that it was prejudicial error for the trial court to content itself with a rereading of the penalty determination instruction in responding to the jury's question. He contends that the question itself indicated that the jurors were confused as to the scope of their sentencing discretion, that rereading the instruction already given did nothing to dispel that confusion, and that the prompt return of a capital sentence demonstrates the decisive effect of the trial court's failure to inform the jury that the correct answer to the question was, as the defense argued, literally "yes." We are not persuaded that, under these circumstances, the trial court's decision to reread to the jury the text of the pertinent instruction was error.

We have already concluded, *ante*, at page 640 that it was not error for the trial court to give the jury the penalty determination instruction that it did. Given that conclusion, we cannot say that a repetition of the instruction was error. There is merit in the argument of the People that the unqualified "yes" sought by the defense, without more, would have failed to convey to the jury the guided nature of its sentencing discretion in a capital case. The most that can be said of the trial court's response to the jury's query was that it represented an unwillingness to venture beyond the safety of standardized instructions. After hearing argument of counsel and considering the matter, the trial court exercised its discretion, electing not to risk diverging from the

---

[10]The jury's first question, the answer to which defendant does not challenge, asked "[i]nterpretation [*sic*] of the 'you' in paragraph four of [CALJIC No.] 8.84.2, 'in the event that you cannot so find, you shall impose life without possibility of parole,' does the 'you' refer to the individual juror [or] to the jury collectively?"

In response, the trial judge stated: "As I've instructed you, each of you have to decide the punishment by yourselves. Obviously you deliberate together; however, before you can render a verdict as to which punishment can be imposed, all 12 of you must agree to that punishment."

instruction by additional comment. Given the record, we cannot say that its decision was an abuse of discretion. (*People* v. *Beardslee* (1991) 53 Cal.3d 68, 97 [279 Cal.Rptr. 276, 806 P.2d 1311].)

Defendant's claim that the prejudicial effect of the instruction is established by the speed with which the jury returned a verdict of death after receiving it, rests on unprovable speculation concerning the course of the jury's deliberations in this case. We must assume that a penalty jury, properly instructed as to its sentencing responsibility in a capital case, will deliberate in accordance with those instructions. Here, we conclude that the jury was properly instructed regarding the nature of the penalty determination not once, but twice.

D. *Prosecution's alleged use of nonstatutory aggravating factors in penalty phase argument.*

Defendant contends that comments made by the prosecutor in his closing penalty argument in effect amounted to the introduction of aggravating penalty evidence not embraced by the factors enumerated in section 190.3. In *People* v. *Boyd* (1985) 38 Cal.3d 762 [215 Cal.Rptr. 1, 700 P.2d 782], we concluded that 1978 amendments to the penalty determination statute, changing it "from a statute in which the listed aggravating and mitigating factors merely guide the jury's discretion to one in which they limit its discretion," rendered inadmissible evidence which "is not probative of any specific listed factor," as being "irrelevant to aggravation." (*Id.* at pp. 773, 774.) The question here is whether the prosecutor's arguments transgressed this exclusionary line to defendant's prejudice. We conclude that they did not.

Defendant cites three specific arguments by the prosecutor which he contends amounted to *Boyd* error. First, referring to the incident involving Margaret Noone's recantation of her alibi testimony in favor of defendant, the prosecutor stated that defendant, "by the use of force, the threat of force, he coerces and threatens Majorie [*sic*] Noone to come in here and to commit perjury." Defendant himself also committed perjury, the prosecutor continued, an apparent reference to his alibi testimony, supported by Noone's (later recanted) testimony. Second, defendant cites the prosecutor's remark concerning the testimony of his mother and the statement that the jury "should have no sympathy for her [i.e., defendant's mother]. That is her child, she's come in here, and she committed perjury during the penalty phase."

Last, defendant attacks as *Boyd* error the prosecutor's remark that defendant did not merit the sympathy of the jury because his offense had caused

pain to members of his family: "But the question you have to ask yourself is does the Defendant deserve that sympathy for his family members? Because . . . no matter what your verdict is, because whether you say he's going to die or you say he's going to live the rest of his life in San Quentin, they are here because of what he did."

 In each of these instances of alleged prosecutorial misconduct in the penalty argument, as in those discussed, *ante*, at page 638 and following, defense counsel raised no objection, sought no admonition, requested no curative instruction. It is clear, moreover, that the misconduct alleged to have occurred was amenable to remedial measures by the trial judge, given a timely objection. The claims of error are thus waived. (See *People* v. *Cooper* (1991) 53 Cal.3d 771, 843 [281 Cal.Rptr. 90, 809 P.2d 865] and cases cited, *ante*, at p. 638.)

 Moreover, none of the contentions has merit. In the three instances of claimed *Boyd* error, the prosecutor did no more than argue in rebuttal, on the basis of evidence already before the jury, to character evidence offered by defendant under factor (k), the "catch-all" sentencing factor of section 190.3. (§ 190.3, factor (k).) Under factor (k) and its implementing instruction, CALJIC former No. 8.84.1, the penalty jury is directed to consider any circumstance extenuating the offense and any "sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." (*Ibid.*)

There was nothing improper in such rebuttal argument, as we noted in *People* v. *Boyd, supra,* itself. "Once the defense has presented evidence of circumstances admissible under factor (k), . . . prosecution rebuttal evidence would be admissible as evidence tending to 'disprove any disputed fact that is of consequence to the determination of the action.' [Citation.]" (38 Cal.3d at p. 776.) Thus, "a defendant who introduces good character evidence widens the scope of the bad character evidence that may be introduced in rebuttal." (*People* v. *Fierro* (1991) 1 Cal.4th 173, 237 [3 Cal.Rptr.2d 426, 821 P.2d 1302].) The scope of rebuttal legitimately embraces argument by the prosecutor "suggesting a more balanced picture of [the accused's] personality." (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 791 [230 Cal.Rptr. 667, 726 P.2d 113].)

Here, as in *People* v. *Fierro, supra,* 1 Cal.4th 173, the prosecutor "could properly refer in closing argument to prior criminal conduct which had not been admitted as evidence in aggravation under section 190.3." (*Id.* at p. 237.) The limitation on such rebuttal argument—that it "relate directly to a

particular incident or character trait defendant offers in his own behalf" (*id.* at p. 238)—was met here. Defendant's evidence in mitigation at the penalty phase portrayed him as someone of good character, offering as examples his participation in the California Blue Jackets youth organization, high school sports and other school activities, as well as his church activities and school prizes. Similarly, Margaret Noone's recantation undermined the credibility of defendant's mother's testimony, evidence that the prosecution was entitled to rebut by arguing the evidence.

 In any event, any error in the prosecutor's closing penalty argument was harmless. Reviewing the record as a whole, we are not persuaded that, had a timely objection been made to the claimed misconduct and a curative instruction given, it is reasonably possible that defendant would have obtained a more favorable result.[11]

E. *Claim that improper voir dire and closing penalty argument combined to reduce the jury's sentencing discretion.*

In the course of the sequestered voir dire proceedings required for the selection of a "death qualified" jury (see *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 80-81 [168 Cal.Rptr. 128, 616 P.2d 1301]), the trial court permitted the prosecutor to ask each prospective juror whether, in the words of a representative query, the fact that a capital defendant was "18 or 19 at the time of the killing . . . [would] automatically cause you to vote for the lesser punishment of life imprisonment without possibility of parole?" In addition, the prosecutor was permitted to ask each juror in the sequestered voir dire whether "you would be able to consider imposing the death penalty . . . if we have one victim as opposed to requiring that the defendant kill two or more people?"

 Defendant challenges these questions on two grounds. First, he contends they had the impermissible effect of inducing the jurors to "prejudge" the evidence to be offered against him at trial. Second, he argues that, in combination with certain remarks made by the prosecutor in his closing penalty argument, the questions had the effect of exerting psychological pressure on the jurors, reducing the scope of their sentencing discretion at the penalty phase. Neither claim is persuasive.

At the time of trial, the scope of legitimate inquiry on voir dire embraced both " 'matters concerning which either the local community or the population at large is commonly known to harbor strong feelings that may stop

---

[11]Because we find that there was no error under *People* v. *Boyd, supra,* 38 Cal.3d 762, we reject defendant's claim that trial counsel's failure to make timely objections to the claimed misconduct by the prosecutor amounted to ineffective assistance of counsel within the meaning of the Sixth Amendment guarantee.

short of presumptive bias in law yet significantly skew deliberations in fact' " (*People* v. *Williams* (1981) 29 Cal.3d 392, 408 [174 Cal.Rptr. 317, 628 P.2d 869]) and "reasonable inquiry into specific legal prejudices . . . as the basis for a challenge for cause." (*People* v. *Balderas* (1985) 41 Cal.3d 144, 183 [222 Cal.Rptr. 184, 711 P.2d 480], italics omitted.) As a result of the passage of Proposition 115 in the June 6, 1989, General Election, however, Code of Civil Procedure section 223 now provides that "Examination of prospective jurors shall be conducted only in aid of the exercise of challenges for cause." Whether evaluated under the standard prevailing at the time of trial or the current version of Code of Civil Procedure section 223, we conclude that the prosecutor's questions were entirely proper because they were directly relevant to whether a juror would be subject to a challenge for cause.

As noted, the prosecutor's questions at issue simply inquired whether a juror would *consider* imposing the death penalty in a case in which the defendant was only 18 or 19 at the time of the crime and in which only one victim was killed. If a juror would not even consider the death penalty in such a case, he or she properly would be subject to challenge for cause.

Our decision in *People* v. *Fields* (1983) 35 Cal.3d 329 [197 Cal.Rptr. 803, 673 P.2d 680] speaks directly to the point. In discussing the permissible scope of death penalty voir dire, the *Fields* court stated: "A juror who resolved in advance not to impose the death penalty in the case before him, whatever his views might be in other cases, could not 'conscientiously apply the law as charged by the court' (*Adams* v. *Texas* [(1980)] 448 U.S. 38, 45 [65 L.Ed.2d 581, 589, 100 S.Ct. 2521]) because he had already determined the penalty without considering the relevant aggravating and mitigating factors. It follows that such a juror may be dismissed for cause without violating the constitutional doctrine expounded in *Witherspoon* [v. *Illinois* (1968) 391 U.S. 510 (20 L.Ed.2d 776, 88 S.Ct. 1770)] and *Adams*." (35 Cal.3d at p. 357.) The *Fields* court then concluded that although ". . . a court may properly prohibit voir dire which seeks to ascertain a juror's views on the death penalty in actual or hypothetical cases not before him," ". . . a court may properly excuse a prospective juror who would automatically vote against the death penalty in the case before him, regardless of his willingness to consider the death penalty in other cases." (*Id.* at pp. 357-358, fn. omitted.)

Because the challenged voir dire questions in this case were directly relevant to and "in aid of" the exercise of a challenge for cause, the questions were proper, both under the standards governing voir dire in effect at the time of trial and the narrower standard enacted by Proposition 115.

■ In light of our conclusion that the specific questions posed by the prosecutor on voir dire simply inquired whether a juror would *consider* the death penalty if the defendant were 18 or 19 and only 1 person had been killed and were thus not improper, defendant's related argument—that the prosecutor's reference in his closing penalty phase argument to the voir dire questions and the jurors' answers to them overcame the jurors' natural reluctance to impose the death penalty in this case—loses its force.

In arguing these points to the jurors, the prosecutor was not contending that defendant's relative youth, or the fact that he did not kill more than one victim, could not be taken into consideration by the jury in determining whether the death penalty was appropriate. Rather, he was merely making the entirely proper argument that the circumstances under which the murder of Jovita Navarro occurred were sufficiently aggravating to warrant the death penalty, despite defendant's youth and the fact that there was only one victim. Such an argument did not limit the jury's sentencing discretion.

F. *Refusal of the trial court to give pinpoint penalty instructions requested by the defense.*

In its instructions to the jury concerning the sentencing function following the close of the penalty phase, the trial court gave CALJIC No. 8.84.1, relevant portions of which are set out below.[12] In addition, the jury was instructed that the mitigating factors enumerated in the instructions were "only examples" of mitigating factors that the jury could consider in assessing the penalty, that they should "pay careful attention" to the factors in mitigation, that they were "not required to limit your consideration of mitigating circumstance [*sic*] to these factors" but could consider "other circumstances as reasons for not imposing the death penalty," and that "any mitigating circumstances, standing alone, may be sufficient to support a decision that life without the possibility of parole is the appropriate punishment."

The trial court refused, however, to give a lengthy special instruction requested by the defense consisting of 15 subparts purporting to guide the

---

[12]"In determining which penalty is to be imposed on the defendant, you shall consider all of the evidence which has been received during any part of the trial of this case. You shall consider, take into account and be guided by the following, if applicable:

" . . . . . . . . . . . . . . . . . . . . .

"(k) Any other circumstance which extenuates the gravity of the crime even though its [*sic*] not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for [*sic*] sentence less than death, whether or not related to the offense for which he is on trial. You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle."

jury in reaching its penalty determination.[13] ▮▮ Defendant claims that the trial court was required to give the proffered instruction by *People* v. *Sears* (1970) 2 Cal.3d 180, 189-90 [84 Cal.Rptr. 711, 465 P.2d 847], and that the failure to do so violated his rights under the Fifth, Eighth, and Fourteenth Amendments to the federal Constitution. We do not agree.

We upheld the trial court's refusal to give a similar, so-called "pinpoint" penalty determination instruction—also urged on the authority of *Sears*—in *People* v. *Benson, supra*, 52 Cal.3d 754. We pointed out that "Under *Sears* [a criminal defendant] ha[s] a 'right to an instruction that "pinpoint[s] the *theory* of the defense." ' " (*Id.* at p. 806, quoting from *People* v. *Gordon, supra*, 50 Cal.3d at p. 1276, italics in original.) Here, as in *People* v. *Benson, supra*, the proffered special instruction for the most part in effect argued the evidence by "highlight[ing] certain aspects . . . without further illuminating the legal standards at issue [citations]." (*People* v. *Fauber* (1992) 2 Cal.4th 792, 865-866 [248 Cal.Rptr. 600, 755 P.2d 1049].) Other instructions given by the trial court and summarized above adequately covered the defense theory in the penalty phase. Those elements of defendant's special instruction that were not argumentative were thus duplicative, and the trial court did not err in declining to give them. (*People* v. *Wright* (1988) 45 Cal.3d 1126, 1134-1138 [248 Cal.Rptr. 600, 755 P.2d 1049].) There was no error.

### G. *Constitutionality of section 190.3, factors (a) and (i).*

▮▮ Defendant mounts a broad constitutional challenge to the capital sentencing scheme embodied in section 190.3. Specifically, he contends that permitting the jury to consider factors (a) (circumstances of the capital crime) and (i) (the age of the defendant at the time the crime was committed) of section 190.3, without more specific instructional guidance, impermissibly enlarges the sentencing discretion of capital juries and thus runs afoul of vagueness limitations imposed by the Eighth Amendment to the federal Constitution.

We have recently rejected such a challenge directed at the use of section 190.3, factor (a). In *People* v. *Proctor, ante*, page 499 [15 Cal.Rptr.2d 340,

---

[13]Defendant's special instruction No. 14 included the following representative subparts:

". . . (3) That [defendant's] formative years were spent in a closely knit family who generally participated in many activities together;

"(4) That [defendant] was extremely close to his father and that this relationship was severely affected when his parents divorced;

"(5) That [defendant] was thereafter raised by his mother;

". . . . . . . . . . . . . . . . . . . . . . . .

"(12) [Defendant's] artistic potential and musical ability

". . . . . . . . . . . . . . . . . . . . . . . .

"(15) Any other sympathetic or other aspect of [defendant's] character or record that he offers as a basis for a sentence less than death, whether or not related to the offenses for which he is on trial."

842 P.2d 1100], we noted that the "United States Supreme Court itself has established that the circumstances surrounding a capital offense constitute one of the criteria upon which the jury *should* base its penalty determination. [Citations.] The high court has not stated or implied that the factor of the 'circumstances of the offense' [of section 190.3, factor (a)] is unconstitutionally vague." (*Id., supra, ante,* at p. 551, italics in original.)

Likewise, we have said that the defendant's "age," as used in factor (i) of section 190.3, "is . . . a metonym for any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty." (*People* v. *Lucky* (1988) 45 Cal.3d 259, 302 [247 Cal.Rptr. 1, 753 P.2d 1052].) As we have recently stated, both factors direct the attention of the penalty jury to "specific, provable, and commonly understandable facts about the defendant and the capital crime that might bear on his moral culpability. Having met these standards of relevance and specificity, factors (a) . . . and (i), are not 'illusory' or otherwise impermissibly 'vague' (*Stringer* v. *Black* (1992) 503 U.S. __, __ [117 L.Ed.2d 367, 382, 112 S.Ct. 1130]) simply because they leave the sentencer free to evaluate the evidence in accordance with his or her own subjective values." (*People* v. *Tuilaepa, ante,* 569, at p. 595 [15 Cal.Rptr.2d 382, 842 P.2d 1142].)

### H. *Claim that cumulative effect of penalty phase errors requires reversal.*

Defendant contends that the cumulative effect of the asserted penalty phase errors requires reversal of the verdict. There were, however, no errors to accumulate.

### I. *Claim that multiple flaws in the capital sentencing process render the death penalty unconstitutional.*

Last, defendant attacks, as constitutionally defective, multiple features of the 1978 death penalty law; we have rejected and continue to reject these claims. *People* v. *McLain* (1988) 46 Cal.3d 97, 118 [249 Cal.Rptr. 630, 757 P.2d 569]; *People* v. *Jennings* (1988) 46 Cal.3d 963, 980, 981-982, 987-988 [251 Cal.Rptr. 278, 760 P.2d 475]; *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 777-779; *People* v. *Frierson* (1979) 25 Cal.3d 142, 172-188 [158 Cal.Rptr. 281, 599 P.2d 587]; *People* v. *Miranda, supra,* 44 Cal.3d 57, 104-105; *People* v. *Lucky, supra,* 45 Cal.3d 259, 302; *People* v. *Melton* (1988) 44 Cal.3d 713, 757 [244 Cal.Rptr. 867, 750 P.2d 741]; *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1253 [255 Cal.Rptr. 569, 767 P.2d 1047].

CONCLUSION

The judgment is affirmed.

Lucas, C. J., Panelli, J., Kennard, J., Baxter, J., and George, J., concurred.

MOSK, J.—I concur in the judgment. After review, I have found no reversible error or other defect.

I write separately to comment on the majority's treatment of defendant's claim under *Stringer* v. *Black* (1992) 503 U.S. __ [117 L.Ed.2d 367, 112 S.Ct. 1130] (*Stringer*). As I stated in my dissenting opinion in *People* v. *Proctor, ante,* page 499 [15 Cal.Rptr.2d 340, 842 P.2d 1100]:

"In *Stringer*, the United States Supreme Court held that 'if a State uses aggravating factors in deciding who shall be eligible for the death penalty or who shall receive the death penalty, it cannot use factors which as a practical matter fail to guide the sentencer's discretion' in contravention of the Eighth Amendment. [Citation.] It explained: 'Although our precedents do not require the use of aggravating factors, they have not permitted a State in which aggravating factors are decisive to use factors of vague or imprecise content. A vague aggravating factor employed for the purpose of determining whether a defendant is eligible for the death penalty fails to channel the sentencer's discretion. A vague aggravating factor used in the weighing process is in a sense worse, for it creates the risk that the jury will treat the defendant as more deserving of the death penalty than he might otherwise be by relying upon the existence of an illusory circumstance.' [Citation.] Of course, California uses 'aggravating factors'—labeled 'special circumstances' [citation]—to determine death eligibility. It also uses 'aggravating factors'—bearing that very label [citation]—to decide between life and death.

"A narrow *Stringer* challenge could specifically attack any one or more of the factors set out in the standard jury instruction on the determination of penalty as vague and, for that reason, likely to invite an arbitrary and capricious choice of punishment in violation of the Eighth Amendment . . . .

"A broader *Stringer* challenge could generally attack the standard jury instruction on the determination of penalty as vague at its very core and, for that reason, highly likely to invite an arbitrary and capricious choice of punishment in violation of the Eighth Amendment." (*People* v. *Proctor, supra, ante,* at pp. 566-567 (dis. opn. of Mosk, J.); accord, *People* v. *Tuilaepa, ante,* 569, 596-597 [15 Cal.Rptr.2d 382, 842 P.2d 1142] (conc. opn. of Mosk, J.).)

Defendant's *Stringer* challenge is narrow. He attacks factor (a), the "circumstances of the crime," and factor (i), the "age of the defendant at the time of the crime."

The majority reject the claim. They do so because they themselves do not find factors (a) and (i) to be vague. But "[w]hat is dispositive is not what jurists on appellate courts may announce, but what laypersons on juries may understand." (*People* v. *Proctor, supra, ante,* at p. 567 (dis. opn. of Mosk, J.); accord, *People* v. *Tuilaepa, supra, ante,* at p. 597 (conc. opn. of Mosk, J.).) In this regard, consider factor (i). "We have held that 'age' can be aggravating or mitigating or neither depending on the peculiar facts of the individual case. (E.g., *People* v. *Lucky* (1988) 45 Cal.3d 259, 302 [247 Cal.Rptr. 1, 753 P.2d 1052].) Whether a juror would come to the same conclusion, however, is another matter." (*People* v. *Tuilaepa, supra, ante,* at p. 597 (conc. opn. of Mosk, J.).)

In the course of their analysis, the majority appear to suggest that if a factor is not vague, it necessarily passes muster under the United States Constitution, even if it " 'leave[s] the sentencer free to evaluate the evidence in accordance with his or her own subjective values.' " (Maj. opn., *ante,* at p. 649, quoting *People* v. *Tuilaepa, supra, ante,* at p. 595.) Such a proposition would be too broad. "The requirements imposed by the federal charter are substantive as well as formal. Thus, a factor, no matter how clearly defined, is constitutionally invalid if, for example, it authorizes or allows a juror to 'attach[] the "aggravating" label to' matters 'that are constitutionally impermissible or totally irrelevant to the sentencing process, such as . . . the race, religion, or political affiliation of the defendant' or 'to conduct that actually should militate in favor of a lesser penalty, such as perhaps the defendant's mental illness.' " (*People* v. *Tuilaepa, supra, ante,* at pp. 597-598 (conc. opn. of Mosk, J.), quoting *Zant* v. *Stephens* (1983) 462 U.S. 862, 885 [77 L.Ed.2d 235, 255, 103 S.Ct. 2733].)

A successful *Stringer* challenge, it must be noted, does not automatically result in reversal. "As *Stringer* itself makes plain, an instruction incorporating a vague factor is subject to harmless-error analysis." (*People* v. *Tuilaepa, supra, ante,* at p. 598 (conc. opn. of Mosk, J.).) On this record, even if one or both of the factors defendant attacks are deemed vague, no prejudice appears.

In conclusion, having found no reversible error or other defect, I concur in the judgment.

Appellant's petition for a rehearing was denied March 10, 1993.