Filed 10/21/21  P. v. Petty CA4/2
Opinion on remand from Supreme Court

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E072035 |
| v. | (Super. Ct. No. BAF1800674) |
| WILLIAM JOEL PETTY, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Randall Donald White, Judge.  (Retired Judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.).  Modified and affirmed with directions.

Cynthia M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

1

## I.

## INTRODUCTION

Defendant and appellant, William Joel Petty, appeals from the judgment entered following a jury conviction for robbing a Sizzler restaurant (Pen. Code, § 211).[1] The court also found true allegations he had two prior strike convictions (§§ 667, subds. (c) and (e)(1), 1170.12, subd. (e)(1)), two prior serious felony convictions (§ 667, subd. (a)), and six prison priors (§ 667.5, subd. (b)). The trial court sentenced defendant to 25 years to life, plus 14 years in prison.

Defendant contends the trial court violated his due process rights and state law by instructing the jury to consider an eyewitness's certainty when identifying defendant as the perpetrator. Defendant also argues that, in accordance with Senate Bill No. 136 (2019-2020 Reg. Sess.), his four one-year prison priors must be stricken. In addition, defendant argues the trial court erred in ordering him to pay fines, fees, and assessments, because he demonstrated he did not have the ability to pay them.

As to defendant's challenge to CALCRIM No. 315's inclusion of certainty as a factor to be considered in evaluating the accuracy of an identification, we initially rejected that challenge as having previously been rejected by our Supreme Court. After our initial opinion was filed, the California Supreme Court granted review, with further action in the matter deferred pending consideration and disposition of a related issue in *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*). Thereafter the California Supreme

---

[1] Unless otherwise noted, all statutory references are to the Penal Code.

Court held in *Lemcke*, *supra*, 11 Cal.5th 644 that the identification certainty factor in CALCRIM No. 315 did not violate the defendant's state or federal due process rights. This case was then transferred back to this court with directions to vacate our initial opinion and reconsider the cause in light of *Lemcke*. Having done so, we conclude defendant was not prejudiced by the instruction and his state and federal constitutional due process rights were not violated. We also reject defendant's additional contention raised in his post-remand, supplemental brief addressing *Lemcke,* that the identification certainty clause in CALCRIM No. 315 violates state law because it is misleading.

As to defendant's other contentions decided in our previously vacated decision in this matter, our decision is unchanged. We agree with the parties that Senate Bill No. 136 requires this court to strike defendant's four one-year prison priors. As to the court-ordered fines, fees, and assessments, we conclude defendant failed to meet his burden of demonstrating inability to pay the $10,000 restitution fine, $30 criminal conviction assessment fee, or $40 court operations assessment fee. We further conclude the probation officer's recommendation report (probation report) was sufficient to support the trial court imposing the pre-sentence probation report fee, not to exceed $1,095, and booking fee of $514.53. The sentence is therefore modified to strike defendant's four section 667.5, subdivision (b) prior prison term enhancements. The judgment is otherwise affirmed.

FACTS

On May 17, 2018, at 8:40 a.m., Sysco delivery driver, S.M., parked his truck alongside a Hemet Sizzler restaurant. As S.M. was unloading goods, using the backdoor entry into the Sizzler kitchen, he was approached by a man later identified as defendant. While S.M. was on the phone talking to his cousin and brother, defendant told S.M. he was looking for the Sizzler manager and the office. S.M. said, "'She's over there somewhere.'" "'I don't know where she's at. You can go look for her.'" S.M. then noticed defendant appeared to have a gun. Defendant said, "'Walk in the office,'" and "'Either you either walk in there, or you're going to regret it.'"

As S.M. walked toward the office, defendant held what S.M. thought was a gun on S.M.'s back. While walking to the office, S.M. was still on his phone with his cousin and brother. S.M. told them he was being robbed at the Hemet Sizzler, and to call the police. S.M. remained on the phone and continued to tell them what was happening during the robbery. On the way to the office with S.M., defendant grabbed a Sizzler employee and took her with them into the office. When in the office, S.M. noticed the weapon defendant was using was not a gun. It was a construction tool, which appeared to be a nail gun. Defendant then located the Sizzler manager, M.M., in the dining area and told her to come to the office.

M.M. testified that, not knowing what was going on, M.M. walked over to the office. When she approached defendant, he pushed something toward her stomach,

4

grabbed a salad bar attendant, "threw her" towards M.M., and told M.M. to give him all her money. At that point, M.M. realized they were being robbed. M.M. and the other employee walked with defendant into the office. While they were in the office with S.M., defendant told M.M. to get the money out of the safe. Defendant pointed the nail gun at M.M. as she opened the safe and removed the money. M.M. put $3,300 in defendant's bag.

While defendant was distracted by M.M. putting money in the bag defendant was holding, S.M. ran out of the office and called 911. Throughout the robbery, S.M. had been relaying over his phone what was happening during the robbery to his cousin and brother. When defendant noticed S.M. had left the office, defendant fled with the bag of money.

S.M. testified that defendant was wearing sunglasses, dark clothing, and a beanie, had a short, dark mustache and beard, was African-American, and appeared in his 40's or 50's. M.M. testified defendant had a mustache and beard, was wearing black pants, a gray sweater, a beanie, and sunglasses, and had a black Nike bag.

A. *Surveillance Videos*

Police reviewed surveillance videos from the Sizzler and Circle K, located next to the Sizzler. The videos were played for the jury during the trial. The Circle K video shows defendant pulling into the Circle K parking lot, in a black GMC pickup truck with red writing on yellow paper license plates. Defendant is seen entering the Circle K and then returning to the GMC truck. The Circle K video provided a clear view of defendant

5

wearing a blue t-shirt, tan jacket, and sunglasses. The video shows the GMC truck leave the parking lot, drive towards the Sizzler, circle the parking lot a couple of times, park in the parking lot, drive closer to the Sizzler, and park 40 to 50 feet from the Sizzler's entrance. The Circle K video shows defendant then exit the GMC truck and walk towards the Sizzler service entry carrying a bag. Two minutes later he is seen returning at a quick pace to the GMC truck, reentering the truck, and driving away.

The Sizzler video shows defendant inside the Sizzler during the robbery. Defendant is wearing different clothing than in the Circle K surveillance video. Nevertheless, he appears to be the same person in both videos. His physical features, moustache, and sunglasses appear to be the same in both videos. The Sizzler video shows defendant with a mustache and goatee, wearing black pants, a gray sweater or hoody, a beanie, black shoes with white bottoms, and sunglasses. The robbery lasted about two and a half minutes, from 9:00 a.m. to 9:02 a.m. The police were called at 9:04 a.m.

B. *Vagabond Inn Evidence*

Detective Young testified that, when he was assigned to investigate the Sizzler robbery, he reviewed Officer Lynton's report, the surveillance videos, and still frame photographs from the Sizzler and Circle K videos. The day after the robbery, Young noticed defendant's truck parked in the Hemet Vagabond Inn parking lot. Young ran the vin number on the truck and it showed that defendant was the owner of the truck. Two officers assisting Young showed the hotel manager a photograph from the Circle K video.

6

The hotel manager provided the officers with defendant's hotel room number and a key card to enter the hotel room. Young and the two officers knocked on defendant's hotel room door. No one answered but the officers heard a male voice inside. The officers entered the room using the room keycard. Young testified that upon entering, Young immediately recognized defendant as the same person in the Sizzler and from Circle K surveillance videos. He had a mustache and a short beard.

After arresting defendant and obtaining a search warrant, officers found in defendant's hotel room clothing that matched defendant's clothing in the Circle K and Sizzler surveillance videos. The clothing included the same blue t-shirt and tan jacket defendant wore at the Circle K, a black beanie he wore in the Sizzler, and black shoes with white rubber soles defendant wore at the Circle K and Sizzler. The officers also found a folder that had defendant's name on it. Inside the folder was a Wells Fargo Bank deposit bag containing about $1,000 in cash. Defendant's wallet contained an additional $278 in cash and two separate transaction receipts from Money Mart for wiring $300 to another account. Young testified that officers also found in the hotel room a blue Fila duffle bag, which was different from the black Nike duffle bag defendant used during the robbery.

C. *Additional Evidence Presented at Trial*

Young testified he conducted separate photograph lineups for S.M. and M.M., during which both S.M. and M.M. identified defendant as the Sizzler robber. Young further testified defendant's sunglasses were found in defendant's GMC truck. Young

7

believed the sunglasses looked like the ones defendant wore in the Circle K and Sizzler surveillance videos. Young did not find the nail gun or Nike bag. Young testified he concluded based on all of the evidence he had seen, including the GMC truck, clothing, the description and appearance of the Sizzler robber, the money found in the deposit bag in defendant's hotel room, and the surveillance videos, that defendant was the Sizzler robber.

Young acknowledged during his testimony that someone had reported to dispatch that a red truck had been involved in the Sizzler robbery but he did not know who the caller was. Defendant's sole defense witness, H.G., testified that, at the time of the robbery, she was employed at the Sizzler as a preparer. On the day of the robbery, she arrived for work at the Sizzler at 9:10 a.m. Her shift normally starts at 9:30 a.m. The police interviewed her concerning the robbery on the day of the robbery. She told the police that at 9:15 a.m., she saw a man running towards a big, dark red truck. When the police showed her a photograph of a truck, she told them it was not the same truck she saw. H.G. acknowledged that when she saw the truck, she was focused on her phone and got confused about what she saw. H.G. said she did not witness the robbery. She saw someone leave the Sizzler, get into a truck, and drive away. Defendant's investigator interviewed her. She told him she saw either a red or dark colored truck. She was told the cameras showed a black truck. This confused H.G. H.G. acknowledged she was confused about the color of the truck.

8

III.

CALCRIM NO. 315

Defendant contends that the trial court denied his due process rights by giving CALCRIM No. 315, which instructed the jury that when evaluating the accuracy of a witness's identification of the defendant, the jury consider, among other factors: "How certain was the witness when he or she made an identification?"{2CT 367}

After this court issued its decision in this case, holding that there was no instructional error under *People v. Wright* (1988) 45 Cal.3d 1126, 1141-1143, *People v. Johnson* (1992) 3 Cal.4th 1183, 1231-2132, and *People v. Sánchez* (2016) 63 Cal.4th 411, 461-463 (*Sánchez*), the California Supreme Court granted defendant's petition for review and deferred deciding the identification certainty issue until after deciding a similar issue in *Lemcke*, *supra*, 11 Cal.5th 644. After *Lemcke* was decided, the California Supreme Court remanded this case back to this court to reconsider and decide the identification certainty issue based on *Lemcke*. In a supplemental brief, defendant acknowledges that in *Lemcke* the court held that the identification certainty factor in CALCRIM No. 315 did not violate the defendant's due process rights. However, defendant argues that the instruction violates state law because the instruction is misleading.[2] Defendant argues that giving the instruction therefore constitutes prejudicial error requiring reversal.

---

[2] The People did not file a supplemental brief on the issue.

9

The People contend defendant forfeited any challenge to the instruction by failing to object in the trial court. Regardless of whether defendant forfeited the issue, we reject defendant's challenge to the instruction on the merits. In doing so, we review defendant's objection to the instruction de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

A. *Identification Facts*

S.M. and M.M. identified defendant as the perpetrator of the robbery in photograph lineups and in court. M.M. testified that a little before 9:00 a.m., on the day of the robbery, she saw an employee talking with someone at the salad bar. M.M. identified in court the person as defendant. M.M. testified it was about two and a half minutes from the time she first saw defendant until he fled. The officers arrived about three minutes later. M.M. showed the officers the Sizzler surveillance video. During the trial, M.M. identified defendant in the video. M.M. further testified that Officer Lynton interviewed her. An hour and a half later he returned, showed her and other Sizzler employees a still photograph from the Circle K surveillance video, and told her it was a photograph of the robber. Four days later, on May 21, 2018, she participated in a photograph lineup conducted by Young, during which she selected defendant's photograph as the perpetrator.

S.M. testified Young conducted a photograph lineup on May 23, 2018. During the photograph lineup, S.M. selected defendant's photograph from six photographs. S.M. testified that he recognized defendant as the Sizzler robber "right away," and that S.M.

10

was certain at the time of trial that defendant was the robber. At the time of the photograph lineup, S.M. asked if the robber had already been arrested. S.M. did not recall what he was told. S.M. also asked if he had selected the right person as the robber and the officer said he could not tell S.M. S.M. testified that, before he and defendant went into the Sizzler office, S.M. got a good look at defendant. S.M. said that he and defendant were a foot away from each other, and they were face to face "more than once," for "10, 15 seconds." S.M. added that before he and defendant went into the Sizzler office, S.M. had "a lot of eye contact."

Young testified that on May 23, 2018, he conducted a photograph lineup with S.M. S.M. asked Young if the defendant had already been arrested, and Young told him they had someone in custody. Young testified that during the photograph lineup with M.M., she narrowed down her selection to two photographs, one of which included defendant.

B. *Analysis*

Defendant argues the CALCRIM No. 315 witness identification certainty factor is contrary to empirical studies that show witness certainty has no correlation with identification accuracy and is therefore misleading and violates state law. The court in *Lemcke* agreed that, "Contrary to widespread lay belief, there is now near unanimity in the empirical research that 'eyewitness confidence is generally an unreliable indicator of accuracy.' [Citations.]" (*Lemcke*, *supra*, 11 Cal.5th at p. 647.) *Lemcke* further stated that, "[a]s currently worded, CALCRIM No. 315 does nothing to disabuse jurors of that

11

common misconception, but rather tends to reinforce it by implying that an identification is more likely to be reliable when the witness has expressed certainty." (*Id.* at p. 647.) Nevertheless, the court in *Lemcke* concluded the instruction did not violate federal or state due process rights to a fair trial, and therefore the court did not reverse the decision. (*Id.* at pp. 646-647.)

Although the court in *Lemcke* recognized the significance that witness certainty plays in the factfinding process, the *Lemcke* court did not state or suggest that the instruction violated any state law or the state constitution. The *Lemcke* court, however, requested the Judicial Council and its Advisory Committee on Criminal Jury Instructions to evaluate whether or how the instruction might be modified and directed trial courts to omit the certainty factor from CALCRIM No. 315 unless the defendant requests otherwise. (*Lemcke*, *supra*, 11 Cal.5th at p. 647)

Defendant argues the instruction violates state law because it is misleading, but the defendant does not identify any specific law or cite any supporting case law or statutory authority. *Lemcke* does not discuss whether the instruction violates state law, other than stating it does not violate state constitutional due process rights. *Lemcke* states that there is "nothing in CALCRIM No. 315's instruction on witness certainty that operates to 'lower the prosecution's burden of proof.' As *Sánchez*, *supra*, 63 Cal.4th 411, explained with respect to CALJIC No. 2.92's similarly worded instruction, the instruction does not direct the jury that 'certainty equals accuracy.' (*Sánchez*, at p. 462.) Nor does the instruction state that the jury must presume an identification is accurate if the eyewitness

has expressed certainty.  (Cf. *Francis v. Franklin* (1985) 471 U.S. 307, 316 [instruction that 'directs the jury to presume an essential element of the offense' violates due process].)  Instead, the instruction merely lists the witness's level of certainty at the time of identification as one of 15 different factors that the jury should consider when evaluating the credibility and accuracy of eyewitness testimony.  The instruction leaves the jury to decide whether the witness expressed a credible claim of certainty and what weight, if any, should be placed on that certainty in relation to the numerous other factors listed in CALCRIM No. 315.  Indeed, even [the defendant] acknowledges that, on its face, the instruction is 'superficially neutral.'"  (*Lemcke*, *supra*, 11 Cal.5th at p. 655.)

The *Lemcke* court added that, "[a]lthough the wording of the instruction might cause some jurors to infer that certainty is generally correlative of accuracy [citation], [the defendant] was permitted to present expert witness testimony to combat that inference."  (*Lemcke*, *supra*, 11 Cal.5th at pp. 657-658.)  The court in *Lemcke* does not indicate the instruction is unlawful.

We conclude that under *Lemcke*, the identification certainty factor in CALCRIM No. 315 did not violate defendant's state or federal due process rights.  (*Lemcke*, *supra*, 11 Cal.5th at pp. 646-647.)  Defendant also has not established that the identification certainty factor violated any state law.

13

IV.

SENATE BILL NO. 136

Defendant contends, and the People agree, that recently enacted Senate Bill No. 136 applies retroactively to this case. Senate Bill No. 136 amended section 667.5, subdivision (b), effective January 1, 2020. (Stats. 2019, ch. 590, § 1.) Senate Bill No. 136 narrowed eligibility for a one-year prior prison term enhancement to those who have served a prior prison sentence for a sexually violent offense. Defendant was sentenced on January 11, 2019. The trial court imposed four prior prison term enhancements, which were not for sexually violent offenses. Defendant is therefore entitled to the ameliorative benefit of the statute because Senate Bill No. 136 applies retroactively to the instant case.

Whether a particular statute is intended to apply retroactively is a matter of statutory interpretation. (See *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 307 [noting "'the role of a court is to determine the intent of the Legislature'"].) Generally speaking, new criminal legislation is presumed to apply prospectively unless the statute expressly declares a contrary intent. (§ 3.) However, where the Legislature has reduced punishment for criminal conduct, an inference arises under *In re Estrada* (1965) 63 Cal.2d 740, "'that, in the absence of contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.'" (*Lara*, *supra*, at p. 308.) "A new law mitigates or lessens punishment when it

14

either mandates reduction of a sentence or grants a trial court the discretion to do so." (*People v. Hurlic* (2018) 25 Cal.App.5th 50, 56.)

There is no indication in Senate Bill No. 136 or its associated legislative history that the Legislature intended Senate Bill No. 136 and amended section 667.5, subdivision (b) not to apply retroactively to all defendants whose sentences were not yet final when the bill went into effect on January 1, 2020. Under such circumstances, we find that *Estrada*'s inference of retroactive application applies. (*People v. Cruz* (2020) 46 Cal.App.5th 715, 738-739; *People v. Lopez* (2019) 42 Cal.App.5th 337, 340-342 [Senate Bill No. 136 applies retroactively to cases not yet final on appeal]; *People v. Jennings* (2019) 42 Cal.App.5th 664, 680-682.) Therefore, defendant is entitled to have his four one-year prior prison term enhancements stricken.

V.

FINES, FEES, AND ASSESSMENTS

Defendant contends the trial court abused its discretion in imposing various fines, fees, and assessments, including a $10,000 restitution fine, $30 criminal conviction assessment fee, $40 court operations assessment fee, presentence probation report fee, not to exceed $1,095, and booking fee of $514.58. Defendant argues they were improper because he does not have the ability to pay them.

A. *Procedural Background*

During defendant's sentencing hearing on January 11, 2019, the court stated it had received and considered the probation officer's sentencing recommendation report filed

15

on November 30, 2016. The court said it intended to follow the probation officer's recommendations. Defendant, who represented himself in propria persona, asserted in response that his 1984, 35 year-old robbery conviction prior should be stricken because there was no "*Tahl*" waiver[3] showing he intelligently pled to the crime. Defendant also objected to his 1999 robbery prior because the information alleged larceny, not robbery, and he did not knowingly and intelligently plead to that prison prior crime.

Defendant mentioned he had a couple of prior felony convictions that should be reduced to misdemeanors under Proposition 47. The prosecutor noted that some of defendant's felony priors had already been reduced to misdemeanors and the court therefore had found they did not qualify as prior enhancements. The other priors required the filing of a petition. As to those, the trial court in the instant case stated defendant's request to reduce the felony priors to misdemeanors was not properly before the court.

The court denied defendant probation and imposed a 14-year determinate prison term, which included five years for each of defendant's two serious priors (§ 667, subd. (a)) and one year for each of the other four priors (§ 667.5, subd. (b)). The court further sentenced defendant to an indeterminate term of 25 years to life for his robbery conviction. The court ordered defendant to pay the cost of the presentence probation report, with the probation department to determine the amount, not to exceed $1,095.

---

[3] Under *In re Tahl* (1969) 1 Cal.3d 122, 132, each of the three constitutional rights- "self-incrimination, confrontation, and jury trial-must be specifically and expressly enumerated for the benefit of and waived by the accused prior to acceptance of his guilty plea." (*People v. Allen* (1999) 21 Cal.4th 424, 427, 435.)

Defendant was further ordered to pay a booking fee of $514. In addition, the court ordered defendant to pay a $10,000 restitution fine; a stayed $10,000 parole revocation restitution fine; a $30 criminal conviction assessment fee; and a $40 court operations assessment fee.

In response to the sentencing order, defendant stated that the trial court had previously declared that he was indigent. He further told the court he did not have the ability to pay $10,000 in restitution. The court responded that, if he wanted to contest the fine, he needed to present the court with evidence. In response, defendant again said he had been declared an indigent by the court. The court said, "that was then; this is now." Defendant replied, "I still don't have any money." The court again told defendant he would need to present the court with evidence of that fact, which the court said it would be happy to consider. Defendant did not present or offer to present any evidence of inability to pay, or request a continuance for an additional hearing to present such evidence. As a consequence, the fines, fees, and assessments were ordered as initially stated by the court.

B. *Forfeiture*

The People argue defendant forfeited his ability-to-pay objections to the $30 criminal conviction assessment fee, $40 court operations assessment fee, presentence probation report fee, and booking fee of $514. We conclude there was no forfeiture of any of defendant's objections to the fines, fees, and assessments because defendant told the court he objected to the maximum $10,000 restitution fine. The court rejected

17

defendant's objection to the restitution fine, stating defendant had not met his burden of providing evidence of his inability to pay the fine.

It would have been reasonable for defendant to conclude that objecting to the other subsequently imposed fines and fees was futile, based on the court's ruling that defendant had failed to prove inability to pay the $10,000 restitution fine. Therefore, defendant did not forfeit his objections on appeal to the other fines and fees. In addition, it can be reasonably concluded, based on the trial court's treatment of defendant's objection to the restitution fine, that any other subsequent objections based on inability to pay would have been rejected. (*People v. Noguera* (1992) 4 Cal.4th 599, 638; *People v. Arias* (1996) 13 Cal.4th 92, 159-160.)

C. *Restitution Fine*

Defendant contends the trial court abused its discretion in imposing a $10,000 restitution fine, which was the maximum fine that could be imposed under section 1202.4, subdivision (b). Defendant argues that the fine must be stayed until the People demonstrate that defendant has the ability to pay the $10,000 restitution fine.

During sentencing, defendant objected to the restitution fine on the ground he could not pay it. Defendant told the court he did not have any money to pay the fine. He added that the court had previously found at arraignment that he was indigent. The clerk's transcript shows that during arraignment, the trial court found that defendant did not have the ability to pay the public defender registration fee. Arraignment was in May 2018, eight months before the sentencing hearing on January 11, 2019. The trial court

18

responded during sentencing, "[T]hat was then; this is now." Defendant replied that he still did not have any money. Defendant had been incarcerated continuously since his arraignment.

Section 1202.4, subdivision (b)(1), which provides for imposition of a restitution fine, states in relevant part: "(b) In every case where a person is convicted of a crime, the court *shall impose* a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record. [¶] (1) The restitution fine *shall be set at the discretion of the court and commensurate with the seriousness of the offense*. If the person is convicted of a felony, the fine shall not be less than three hundred dollars ($300) and not more than ten thousand dollars ($10,000)." (Italics added.) Here, the trial court imposed the maximum restitution fine of $10,000, where defendant had committed the serious offense of armed robbery.

Section 1202.4, subdivision (b)(2) states that, "[i]n setting a felony restitution fine, the court may determine the amount of the fine as the product of the *minimum fine* pursuant to paragraph (1) *multiplied by the number of years of imprisonment* the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted." (Italics added.) Applying this suggested formula in the instant case, the restitution fine would total $11,700 for defendant's 25 years to life plus 14 year sentence (39 years X $300). The trial court would then be required to reduce the fine to the maximum fine of $10,000 permitted under section 1202.4, subdivision (b)(1). Here,

19

the trial court imposed a $10,000 restitution fine, which is consistent with the suggested formula in section 1202.4, subdivision (b)(2).

Section 1202.4, subdivision (c) provides that "[t]he court shall impose the restitution fine unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record. A defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution fine. *Inability to pay may be considered only in increasing the amount of the restitution fine in excess of the minimum fine pursuant to paragraph (1) of subdivision (b)*." (Italics added.) In the instant case, there was no showing of "compelling and extraordinary reasons" for not imposing a restitution fine. While under section 1202.4, subdivision (c), inability to pay may be considered when imposing a restitution fine in excess of the $300 minimum fine, inability to pay alone is not determinative. Other factors may be considered in addition to inability to pay when the trial court exercises its discretion in determining the amount of the restitution fine.

With regard to a defendant's inability to pay fines, section 1202.4, subdivision (d) states that, "[i]n setting the amount of the fine pursuant to subdivision (b) in excess of the minimum fine pursuant to paragraph (1) of subdivision (b), the court shall consider any relevant factors, including, but not limited to, *the defendant's inability to pay*, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered losses as a result of the crime, and the number of victims involved

20

in the crime. Those losses may include pecuniary losses to the victim or his or her dependents as well as intangible losses, such as psychological harm caused by the crime. *Consideration of a defendant's inability to pay may include his or her future earning capacity.*" (Italics added.)

In the instant case, defendant argued he did not have the ability to pay the $10,000 restitution fine. However, he did not present any evidence of this, other than his own statement to the court that he did not have any money, which was not under oath. He also noted that the trial court had determined he was indigent at his arraignment hearing. The trial court told defendant the court was willing to consider evidence showing defendant did not have an ability to pay the fine and noted defendant had not met his burden of providing evidence of inability to pay. Defendant did not state he had any evidence of inability to pay or request a continuance to provide such evidence. Under section 1202.4, subdivision (d), "[a] defendant shall bear the burden of demonstrating his or her inability to pay." Furthermore, section 1202.4, subdivision (d) states that "[e]xpress findings by the court as to the factors bearing on the amount of the fine shall not be required. A separate hearing for the fine shall not be required."

The record on appeal demonstrates that defendant was given the opportunity to prove inability to pay the restitution fine and failed to do so. Although the court had previously found defendant indigent for the purpose of paying defense costs, this did not establish inability to pay defendant's fines and fees imposed at sentencing. "[A] defendant may lack the 'ability to pay' the costs of court-appointed counsel yet have the

21

'ability to pay' a restitution fine." (*People v. Douglas* (1995) 39 Cal.App.4th 1385, 1397.) This is because the statutory requirements for finding inability to pay the costs of appointed counsel differ (§ 987.8) and are easier to establish than establishing inability to pay a restitution fine under section 1202.4, subdivision (b). The indigency statute, section 987.8, does not allow for consideration of prison wages and provides that, "[u]nless the court finds unusual circumstances, a defendant sentenced to state prison shall be determined not to have a reasonably discernible future financial ability to reimburse the costs of his or her defense." (§ 987.8, subd. (g)(2)(B).)

The People argue that the trial court could reasonably consider defendant's future earning capacity while incarcerated. The People assert that prison wages may range from $12 to $56 a month, depending on an inmate's skill level. (Cal. Code Regs., tit. 15, § 3041.2; Cal. Dept. Of Corrections and Rehab., Adult Institutions Operations Manual (2019), art. 12 (Inmate Pay), §§ 51120.1, 51120.6, pp. 354-356.) The People contend it will take defendant about 15 years to pay the $10,000 restitution fine, assuming he makes $56 a month, using his specialized construction skills. Citing *People v. Rodriguez* (2019) 34 Cal.App.5th 641 (*Rodriguez*), defendant argues that "The inmate minimum wage in California prisons is $0.08 per hour and $12 per month." (*Id*. at p. 649.) The court in *Rodriguez* further stated that prison wages were up to $0.32 per hour for inmates with specialized skills, such as dental techs and welders. (*Ibid*.) Defendant argues that it will take him 69 years and five months to repay the $10,000 restitution fine, assuming he

makes $12 per month in prison. During sentencing, neither party presented evidence of defendant's prospective prison wages.

The People further argue that the probation report, which the trial court stated it had received and considered without any objection from defendant, supported a reasonable finding that defendant was able to pay the $10,000 restitution fine and the other fees. The probation report stated that, before defendant's arrest in May 2018, he had been employed in construction; earned about $4,000 a month; had $1,250 in expenses, including rent, utilities, and vehicle costs; was unmarried; and had one child.

According to the probation report, defendant had said he spent $100 a day on methamphetamine, which he started using three weeks before his arrest, when he was 52 years old. Defendant also told the probation officer that up until about the time he started using methamphetamine, everything was great. He had been employed continuously for over a year and a half, since January 2017; he was physically healthy with no physical disabilities; and had recently purchased his truck. The People argue that, based on information in the probation report, he had $2,750 in monthly disposable income. The People note that the court should not assume defendant had no assets because he was using methamphetamine, because he reported that he did not start using methamphetamine until three weeks before his arrest.

Under section 1202.4, it was within the trial court's discretion to impose the restitution fine based on factors other than or in addition to ability to pay, such as the seriousness of the offense and length of the defendant's sentence, consistent with the

formula suggested in section 1202.4, subdivision (d).  In *People v. Nelson* (2011) 51 Cal.4th 198 and *People v. Gamache* (2010) 48 Cal.4th 347, the trial court imposed a $10,000 restitution fine pursuant to section 1202.4.  The defendants in both cases argued that the court erred by failing to take into consideration the defendant's ability to pay.  In both cases, the California Supreme Court rejected this contention, concluding there was no error.  The court in *Nelson* and *Gamache* stated that the defendant "'points to no evidence in the record supporting his inability to pay, beyond the bare fact of his impending incarceration.  Nor does he identify anything in the record indicating the trial court breached its duty to consider his ability to pay; as the trial court was not obligated to make express findings concerning his ability to pay, the absence of any findings does not demonstrate it failed to consider this factor.  Thus, we cannot say on this record that the trial court abused its discretion.'"  (*People v. Nelson*, *supra*, 51 Cal.4th at p. 227, quoting *People v. Gamache*, *supra*, at p. 409.)

Here, the defendant failed to cite evidence in the record demonstrating an inability to pay, beyond the bare fact of his impending incarceration and the trial court's previous finding at arraignment that he was indigent for purposes of payment of the cost of representation.  Under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), which was decided three days before defendant's sentencing hearing and is currently being reviewed by the California Supreme Court, the court held that, "although Penal Code section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any

24

restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.)

In the instant case, the court satisfied the *Dueñas* requirement of hearing whether defendant had an ability to pay the restitution fine but it is unclear whether the trial court concluded defendant had the ability to pay the restitution fine. During sentencing, defendant objected to the $10,000 restitution fine on the ground he did not have the ability to pay the fine. The court told defendant he could present evidence of inability to pay and permitted him to argue the issue. As the California Supreme Court concluded in *Nelson* and *Gamache*, "'as the trial court was not obligated to make express findings concerning his ability to pay, the absence of any findings does not demonstrate it failed to consider this factor. Thus, we cannot say on this record that the trial court abused its discretion.'" (*People v. Nelson*, *supra*, 51 Cal.4th at p. 227, quoting *People v. Gamache*, *supra*, 48 Cal.4th at p. 409.)

Furthermore, the probation report indicated defendant may have had assets which could be used to pay the court imposed fines and fees. According to the probation report, he had been continuously employed from January 2017, up until his arrest in May 2018; up until he stopped working two weeks before his arrest, he had $2,750 in monthly discretionary income; he had recently purchased a new truck; he was in good physical health; and he had skills which would enable him to work in prison while serving his 39 year prison term.

We conclude the trial court did not abuse its discretion in imposing the $10,000 restitution fee because the record demonstrates that, in accordance with *Dueñas*, the trial court permitted defendant to introduce evidence demonstrating inability to pay the restitution fine, the court considered defendant's inability-to-pay objection to the fine, the probation report indicated defendant had the ability to pay the fine, and, under *Nelson* and *Gamache*, "'we cannot say on this record that the trial court abused its discretion.'" (*People v. Nelson*, *supra*, 51 Cal.4th at p. 227, quoting *People v. Gamache*, *supra*, 48 Cal.4th at p. 409.)

D.  *Criminal Conviction Assessment Fee and Court Operations Assessment Fee*

Defendant contends the mandatory $30 criminal conviction assessment fee (Gov. Code, § 70373) and $40 court operations assessment fee (§ 1465.8) must be stricken under *Dueñas*, *supra*, 30 Cal.App.5th 1157, because he does not have the ability to pay the fees.  Defendant asserts that he does not have the ability to pay the $70 fees because the fees cannot be paid until he has paid the $10,000 restitution fine.

In *Rodriguez*, *supra*, 34 Cal.App.5th 641, the court explained that the "defendant's $300 restitution fine must be paid first.  (§ 1203.1d [payments allocated to restitution fine before reimbursement orders].)  The California Department of Corrections and Rehabilitation (CDCR) will collect direct victim restitution and the restitution fine by deducting up to 50 percent of defendant's trust account deposits, including any prison wages he may earn.  (§ 2085.5, subds. (a)-(d); Cal. Code Regs., tit. 15, § 3097, subds. (f)-(g); Code Civ. Proc., § 704.090 [exempting $300 in inmate trust account funds from

26

restitution fines and $1,225 from other money judgments]; but see *In re Betts* (1998) 62 Cal.App.4th 821 [73 Cal.Rptr.2d 254] [Code Civ. Proc., § 704.090 does not apply to inmate wages or trust account deposits].)" (*Rodriguez, supra*, 34 Cal.App.5th at p. 649.) In addition, "[b]efore crediting a payment to defendant's court-ordered debts, CDCR will deduct a 10 percent administrative fee. (Cal. Code Regs., tit. 15 § 3097, subd. (c); see §§ 1202.4, subd. (l) [authorizing fee up to 10 percent of the restitution fine to cover actual administrative costs], 2085.5 [same].)" (*Rodriguez, supra*, at p. 649.)

In *Dueñas, supra*, 30 Cal.App.5th at page 1164, the court concluded that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under Penal Code section 1465.8 and Government Code section 70373." In accordance with *Dueñas*, here, the trial court considered defendant's ability to pay the restitution fine and permitted him to demonstrate he was unable to pay the fine. The trial court reasonably found defendant had not shown he was unable to pay the restitution fine. Although defendant did not argue he could not pay the $70 in fees, it is not reasonably probable that the outcome would have been any different as to the relatively minimal amount of fees in light of the ability-to-pay hearing on the $10,000 restitution fine. Even if the trial court erred under *Dueñas* in not separately addressing defendant's ability to pay the $70 fees, such error, if any, was harmless and does not require remand for a separate hearing on the matter.

E. *Probation Report Fee and Booking Fee*

Defendant contends the trial court abused its discretion in imposing the probation report fee, not to exceed $1,095 (§ 12031b) and $514.58 booking fee (Gov. Code, § 29550.2), because the record demonstrated defendant lacked ability to pay the fees. Defendant argues he established he could not pay any of the fines, fees, or assessments. He asserts he told the trial court during sentencing that he did not have any money to pay them, noting that the trial court had determined he was indigent at the time of arraignment, and he had no opportunity to earn any income thereafter because he had remained in custody up until the time of sentencing. Defendant also argues the sentencing probation report did not disclose he had any significant assets at the time of his arrest.

As defendant notes, unlike the restitution fine, the burden was not on defendant to prove ability to pay the probation report and booking fees. With regard to the probation report fee, section 1203.1b, subdivision (b) provides in relevant part that "[t]he court shall order the defendant to pay the reasonable costs if it determines that the defendant has the *ability to pay* those costs *based on the report of the probation officer*." (Italics added.) In determining whether a defendant has the ability to pay the probation report fee, "the court shall take into account the amount of any fine imposed upon the defendant and any amount the defendant has been ordered to pay in restitution." (§ 1203.1b, subd. (b)(3).)

Section 1203.1b, subdivision (e) provides that the term "'ability to pay'" means the overall capability of the defendant to reimburse the costs, or a portion of the

costs . . . and shall include, but shall not be limited to, the defendant's: [¶] (1) Present financial position. [¶] (2) Reasonably discernible future financial position. In no event shall the court consider a period of more than one year from the date of the hearing for purposes of determining reasonably discernible future financial position. [¶] (3) Likelihood that the defendant shall be able to obtain employment within the one-year period from the date of the hearing. [¶] (4) Any other factor or factors that may bear upon the defendant's financial capability to reimburse the county for the costs."

With regard to booking fees, Government Code section 29550.2, subdivision (a), provides that, "'If the person has the ability to pay, a judgment of conviction shall contain an order for payment of' the booking fee. . . . 'When the language of a statute is clear, we need go no further.' [Citation.] Here, the language is clear . . . . Consequently, defendant had the right to a determination of his ability to pay the booking fee before the court ordered payment." (*People v. McCullough* (2013) 56 Cal.4th 589, 592-593.)

"Government Code section 29550.2 places on the People the burden of proving a defendant's ability to pay a booking fee. Because the fee is not 'punishment' for constitutional purposes [citation], the People's burden of proof is by preponderance of evidence [citations]. But a defendant who does nothing to put at issue the propriety of imposition of a booking fee forfeits the right to challenge the sufficiency of the evidence to support imposition of the booking fee on appeal, in the same way that a defendant who goes to trial forfeits his challenge to the propriety of venue by not timely challenging it." (*People v. McCullough*, *supra*, 56 Cal.4th at p. 598.) "[T]he Legislature considers the

financial burden of the booking fee to be de minimis and has interposed no procedural safeguards or guidelines for its imposition." (*Id*. at p. 599.)

In the instant case, the trial court did not make express findings that defendant had the ability to pay the probation report and booking fees. However, such a finding could be reasonably inferred from the trial court's comments and finding of defendant's ability to pay the restitution fine. Defendant was permitted to present evidence refuting a finding of ability to pay the $10,000 restitution fine, and failed to do so. The People's burden to demonstrate defendant's ability to pay the booking fee and probation report fee was met by submitting the probation report, which provided sufficient facts demonstrating defendant had the ability to pay the restitution fine and other court imposed fees and assessments, including the probation report and booking fees.

The probation report indicated that defendant's future financial position and earnings during the year after the sentencing hearing, would likely be minimal. Under section 12.03.1b, subdivision (e), the court was not permitted to consider defendant's prison earnings during his 39 year prison term, other than his earnings within a year after sentencing. However, as discussed regarding defendant's ability to pay the restitution fine, the probation report demonstrated a high likelihood defendant has assets which could be used to pay the fines and fees. According to the uncontested probation report, defendant had been continuously employed from January 2017, up until his arrest, he had $2,750 in monthly discretionary income; and he had recently purchased a new truck. We therefore conclude the trial court reasonably found that defendant had the ability to pay

30

the probation report and booking fees, and thus did not abuse its discretion in ordering the fees.

## VI.

## DISPOSITION

The judgment is modified to strike defendant's four section 667.5, subdivision (b) prior prison term enhancements.  The judgment is otherwise affirmed.  The trial court is directed to prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


CODRINGTON
J.

We concur:


MILLER
P. J.


MENETREZ
J.

31